UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                            \*
UNITED STATES OF AMERICA         \*
                                            \*   13-cr-98-01-JL
            v.                      \*   March 2, 2015
                                            \*   2:10 p.m.
OLUWASEUN ADEKOYA                \*
                                            \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Government:    Arnold Huftalen, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301

For the Defendant:     Theodore M. Lothstein, Esq.
                       Lothstein Law Office PLLC
                       58 Pleasant Street
                       Concord, NH  03301

Probation Officer:     Janice Benard

Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454

2

```
 1                        I N D E X

 2

 3    Witness              Direct    Cross    Redirect    Recross

 4    MATTHEW O'NEILL

 5    By Mr. Lothstein               6                    20/25
      By Mr. Huftalen                         16/22
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:13-cr-00098-JL   Document 149-1   Filed 10/30/25   Page 3 of 93

```
 1                        BEFORE THE COURT

 2            THE CLERK:  Court has before it for

 3   consideration today a sentencing hearing in Criminal

 4   Case No. 13-cr-98-01-JL, United States of America versus

 5   Oluwaseun Adekoya.

 6            THE COURT:  All right, we're here for Mr.

 7   Adekoya's sentencing.  There's also an outstanding

 8   motion.  There was a motion to dismiss under Rule 29 at

 9   the end of the prosecution's case.  That's denied.

10   There will be an order out, might already be out, but it

11   will be out certainly by the time we get the hearings

12   over.

13            Sentencing.  Any victim notifications involved

14   here?

15            MR. HUFTALEN:  No.

16            THE COURT:  No, all right.  All right, then.

17   We suspended the hearing last time because I asked about

18   a couple of issues, and I guess I'll address them now.

19   Well, I mean, I don't know if anybody wants to be heard

20   about them now, but the two issues I'm thinking about

21   are, one, the admissibility of the defendant's proffered

22   statements, the defendant's proffered statements that

23   were given subject to a Kastigar letter which was

24   unsigned but was nonetheless pretty much a Kastigar

25   arrangement, and that's been briefed; and the other
```

Case 1:23-cr-00491-MAD   Document 649-1   Filed 10/30/25   Page 4 of 93

1    issue was the, not legal issues, but there were the

2    Court's questions about whether the state authorities in

3    New Jersey were interested in completing their

4    prosecutions of this defendant subject to writs of

5    habeas corpus or subject to the FBI in this case

6    transporting the defendant back to New Jersey to deal

7    with those charges.

8            My understanding on these issues is no New

9    Jersey state authorities are willing to issue a writ of

10   habeas corpus ad prosequendum to get him to New Jersey,

11   so that won't happen, and that the FBI is not inclined

12   to transport him to New Jersey for that.  So he'll be

13   here in sentencing, bottom line; right?

14           MR. HUFTALEN:  In essence, yes, but it's the

15   Secret Service and the Postal Inspection Service, not

16   the FBI.

17           THE COURT:  I keep saying that, I'm sorry.

18           MR. HUFTALEN:  Each of them expressed an

19   interest in doing it, but for the reasons that I set out

20   in my memo, it can't be done by either of those

21   agencies.

22           THE COURT:  I don't accept those reasons, but

23   that's your position and I'm not going to order it.  My

24   view is it could easily happen, but it won't happen, so

25   the bottom line it's not going to happen.  All right, so

Case 1:23-cr-00491-JL   Document 149-1   Filed 05/30/25   Page 5 of 93

 1   he's here for sentencing.

 2            And as for the proffered -- as for the

 3   statements, the Court is not going to consider his

 4   proffered statements, so the Court adopts the

 5   defendant's position.  I assume we're going to hear

 6   testimony from the agent today, but you shouldn't go

 7   into that.  That will not be considered by the Court.

 8            MR. LOTHSTEIN:  Thank you, your Honor.

 9            THE COURT:  All right.  So, just give me a

10   little bit of the game plan today.  I know you want to

11   present evidence.

12            MR. HUFTALEN:  Nope, I'm done with the

13   evidence.

14            THE COURT:  You're done.

15            MR. HUFTALEN:  Concluded my direct subject to

16   the Court's ruling on the proffer issue, so direct is

17   completed.

18            THE COURT:  All right.  What about cross?

19            MR. LOTHSTEIN:  That's where we left off.  I

20   think that's probably where we start, your Honor.

21            THE COURT:  Probably a good place.  Then I

22   will hear your arguments under the various disagreements

23   you have under the PSR.

24            So you can retake the stand.

25            THE CLERK:  Should I swear him in again or is

1    he --

2              THE COURT:  I think he understands his oath.

3    I'm just going to remind him he's still under oath.

4              THE WITNESS:  Yes, your Honor.

5              THE COURT:  Thank you, sir.

6                        CROSS-EXAMINATION

7    BY MR. LOTHSTEIN:

8         Q.   Good afternoon, Special Agent O'Neill.

9         A.   Good afternoon, sir.

10        Q.   Do you have that Exhibit 1 with you up there,

11   the sentencing Exhibit 1?

12        A.   I'm not sure.  I have a number of exhibits.

13   Which one are you --

14        Q.   This one is the Yahoo chat between ifeowo85

15   and UFPC that's about 50 pages long?

16        A.   Yes, I do.

17        Q.   Do you have those there?

18        A.   I believe so.

19        Q.   I may refer to it at times.  I just want to

20   make sure you have a copy up there.

21              MR. HUFTALEN:  The copy the witness has has

22   some extraneous markings that I put on.  I have a clean

23   copy here if you want to substitute that copy.

24              MR. LOTHSTEIN:  Great, thank you.  Appreciate

25   it.  Your Honor, is it okay if I just give the witness

1    the exhibit in case he needs to refer to it then?

2            THE COURT:  Okay with you?

3            MR. HUFTALEN:  Yes, absolutely.

4            THE COURT:  Yes.

5            MR. LOTHSTEIN:  Thank you, your Honor.

6            MR. HUFTALEN:  Sorry.

7        Q.   BY MR. LOTHSTEIN:  So, I just have some

8    questions for you about how this conspiracy case took

9    form, okay?

10           You were the person who advised as to how many

11   participants there should be?

12       A.   I don't recall that.  Could you point me to --

13       Q.   Yes.  If you look at page four of the

14   transcript.  There's 744442 --

15           MR. LOTHSTEIN:  Your Honor, I'm just going to

16   approach and get the other half of these transcripts and

17   give it back to the prosecuting attorney.

18           THE COURT:  That's fine.  Counsel for both

19   parties may approach the witnesses at any time

20   throughout the hearing for any reason other than

21   something unlawful.

22       Q.   You and the persona UFPC say quote, unquote,

23   five guys; right?

24       A.   Correct.  I believe there was probably some

25   previous communications.  I wouldn't have just said five

1    guys, so there was probably dialogue.  I recall dialogue
2    about how many people to bring.
3         Q.   Right.  But in those dialogues you're the
4    person who advised how many people should be brought;
5    right?
6         A.   Yes.
7         Q.   And that ranged from four to five, is that
8    correct, or does that sound correct?
9         A.   That does.
10        Q.   You're the person who advised how many cars to
11   use.  Four cars?
12        A.   Sure.
13        Q.   The person who actually decided how many cars
14   to use was not Mr. Adekoya; right?  You don't believe
15   that?
16        A.   Well, I provided a number of cars, but that
17   wasn't the number of cars that was actually used.
18        Q.   That's right.  Mr. Adekoya, as far as you
19   understand this case, Mr. Adekoya did not rent any -- he
20   rented zero cars; correct?
21        A.   He did not pay for any cars.
22        Q.   Right.  The people who rented the cars were
23   Banks, Harris, Brown, Adegbesan; right?
24        A.   Correct.
25        Q.   And they rented two cars?

1    A.    That's correct.

2    Q.    But you advised it should be four or five;

3 correct?

4    A.    I advised there should be one car for every

5 person.

6    Q.    You advised that -- you gave him some advice

7 on where to rent cars from to the person who you

8 believed to be Mr. Adekoya but is identified in the

9 transcript as ifeowo85?

10    A.    Okay.

11    Q.    You're the person, you actually told Mr.

12 Adekoya where not to rent cars from; right?

13    A.    If you point me to there, that's probably the

14 case.

15    Q.    Sure.  If you look at page 13, there's entries

16 where you're telling Mr. Adekoya to not, that it's not a

17 good idea to rent cars in New Hampshire?

18    A.    Oh, okay, sure.

19    Q.    You're the one, not Mr. Adekoya, but you

20 determined that phony ATM cards would be the mechanism

21 for a fraud; right?

22    A.    Sure.

23    Q.    You're the person who determined, not Mr.

24 Adekoya, but you, how many phony ATM cards there would

25 be; right?

```
 1        A.   I was supplying the cards, correct.
 2        Q.   And you told Mr. Adekoya it would be 243
 3   cards, and that's on page six?
 4        A.   Okay.
 5        Q.   But in fact the number of cards that were left
 6   at the hotel was exactly 200; right?
 7        A.   Correct.
 8        Q.   And you also determined that number, 200,
 9   because you're the person who had the cards made; right?
10        A.   Yes.
11        Q.   You're the person who chose which banks would
12   be defrauded; right?
13        A.   Yes.
14        Q.   You're the person who chose which bank
15   locations --
16             THE COURT:  Well, just one second.  Does that
17   mean you determined in your official position the number
18   of banks that would be defrauded?
19             THE WITNESS:  I provided a list of ATMs for
20   them to use the cards, however, the actual defrauding
21   would have been the Wells Fargo accounts.
22             THE COURT:  Yeah.
23             THE WITNESS:  Correct.  So --
24             THE COURT:  But, I mean, yeah, the list of
25   ATMs though, which I guess was the number of targets,
```

1   that's generated by you?

2           THE WITNESS:  Yes.

3       Q.   BY MR. LOTHSTEIN:  In fact, what you generated

4   was four different lists; is that right?

5       A.   I believe there were four or five, because I

6   believe we were supposed to have -- they were supposed

7   to have five people.

8       Q.   Right.

9       A.   So it would have been five lists.

10      Q.   So according to the scheme, the way you set it

11  up, it's supposed to be 200 divided by five people, 40

12  cards per person; right?

13      A.   Right.

14      Q.   And the list that you supplied that Mr.

15  Adegbesan picked up at the hotel gave the addresses and

16  locations of which ATMs to hit; right?

17      A.   Yes.

18      Q.   And how many different ATMs total were there?

19      A.   I don't recall.  Probably seven to ten.

20      Q.   And you advised, this is on page eight and

21  ten, how many cars should be used by each person at each

22  ATM.  Twenty by each person at each ATM; correct?

23      A.   Yes.

24      Q.   That was not Mr. Adekoya's idea, it was not

25  ifeowo85's idea, it was your idea; right?

1          A.    Yes.

2          Q.    You're the one who advised don't do it during

3    the daytime hours.  That's on page 14.  Correct?

4          A.    Yes.

5          Q.    You're the one that advised that if a car

6    pulled up behind somebody at an ATM, that they would

7    need to move on from there; right?

8          A.    Yes.

9          Q.    And that's on page, actually I don't have a

10   page for that, but you just said yes so I will go with

11   yes.

12         A.    Right, I believe --

13         Q.    You're the one who came up with the idea that

14   the ATM should be visited in a certain port; right?

15         A.    Yes.

16         Q.    And you communicated that to ifeowo85 who you

17   believed to be Mr. Adekoya; right?

18         A.    Yes, right.

19         Q.    You are certain that Mr. Adekoya was not

20   actually in New Hampshire at the time that Banks,

21   Harris, Brown and Adegbesan were; correct?

22         A.    No.  No.  We didn't know until we made

23   arrests --

24         Q.    I mean, in other words --

25               THE COURT:  Let him finish his answer.

1       Q.    Sure.

2       A.    It wasn't until I returned to my office and

3   started communicating with the defendant that I realized

4   he was not here.

5       Q.    And what I'm asking you, and I probably did

6   not phrase it very well, but your understanding now --

7       A.    Right.

8       Q.    -- is that he was not in New Hampshire; right?

9       A.    Correct.

10      Q.    So, for any of these instructions to be

11  followed out, Mr. Adegbesan would have to have the

12  instructions; right?

13      A.    It would have to have been passed to him,

14  correct.

15      Q.    Every single thing we've talked about, the ATM

16  locations, the order, where the cards would be found,

17  how to divvy them up, how many people should be

18  involved, how many rental cars, all that would have to

19  be communicated to Mr. Adegbesan; right?

20      A.    Well, some of it would have been

21  preoperational planning, and some of it, for example,

22  the order of the ATMs, that would have been something

23  that wouldn't have needed to have any planning because

24  it was clearly laid out on the list that they received

25  when they were at the hotel.

```
1        Q.    Once Mr. Adegbesan picked up that list, Mr.

2   Adegbesan knew the ATM locations; right?

3        A.    Whoever would have read that list would have

4   known the AMT locations.

5        Q.    But you don't have any basis to believe that

6   Mr. Adekoya ever possessed that list; right?

7        A.    No, I don't believe he was ever in New

8   Hampshire during this operation.

9        Q.    So, Mr. Adegbesan may have known more than Mr.

10  Adekoya about that topic, which ATMs to go to; right?

11       A.    Well, by the very nature of the fact that he

12  had the list on his person and he was in New Hampshire

13  and Mr. Adekoya was not, well, then, yes.

14       Q.    You're the one that told Mr. Adekoya that

15  30 percent of the plastic cards may not work; right?

16       A.    I believe I said expect a 70 percent success

17  rate.

18       Q.    So it implies that 30 percent may not work;

19  right?

20       A.    Correct.

21       Q.    Do you recall Mr. Banks in his Mirandized

22  statement saying that the operation, it was his

23  understanding that the whole operation had to be

24  terminated at 3 a.m. that night?

25       A.    I don't recall, but if that's in his statement
```

15

```
 1   then --
 2           MR. LOTHSTEIN:  Can I approach the witness,
 3   your Honor?
 4           THE COURT:  You may throughout the
 5   examination.
 6           MR. LOTHSTEIN:  Thank you, your Honor.
 7       Q.   If you could just read that.  You can read the
 8   whole thing.
 9       A.   I understand that because --
10       Q.   Actually not out loud.  I'm just asking you to
11   read it to refresh your recollection.
12       A.   Oh, okay.  (Witness reading document.)
13       Q.   So Mr. Banks in his Mirandized statement --
14           THE COURT:  Does that refresh your memory?
15           THE WITNESS:  Yes, sir.
16           MR. LOTHSTEIN:  Thank you, your Honor.
17       Q.   Mr. Banks in his Mirandized statement
18   indicated that it was his understanding the whole
19   operation was supposed to be concluded by 3 a.m. that
20   night; right?
21       A.   Yes.
22       Q.   And the arrest would have been when Banks was
23   inserting the very first plastic card into the very
24   first ATM; right?
25       A.   Correct.
```

16

1        Q.    And that was about 12:45?

2        A.    Correct.

3        Q.    So 3 a.m. would be two hours and

4    fifteen minutes after that?

5        A.    Correct.

6              MR. LOTHSTEIN:  I don't have any further

7    questions, your Honor.

8              THE COURT:  Any redirect?

9              MR. HUFTALEN:  Yeah, very briefly.

10             THE COURT:  Take all the time you need.  No

11   rush.

12                     REDIRECT EXAMINATION

13   BY MR. HUFTALEN:

14       Q.    When did Mr. Adekoya first speak with you in

15   the persona of Hieu Minh Ngo about coming to New

16   Hampshire?

17       A.    Roughly early September.

18       Q.    He reached out to you and said what, reached

19   out to you online?

20       A.    Correct.

21       Q.    And I'm not asking you to quote, generally

22   what did he say?

23       A.    Looking to buy personally identifiable

24   information of other people.

25       Q.    And you told him what?

1          A.    Sure, I can get you some, but I'm also doing

2    other things now such as ATM cashouts.

3          Q.    And how did he respond?

4          A.    Favorably, he said he was interested.

5          Q.    In fact, on September 24th he said to you:

6    "Yes, I'm in.  Where are they doing it and how much are

7    we looking at.  How many soldiers do you need so I can

8    talk to them and get them ready."

9               Do you remember getting that from him, from

10   the defendant?

11         A.    I do.  I do.

12         Q.    That would have been on September 24th.  And

13   do you remember getting something from him on

14   September 24th that also said:  "New Hampshire?  I can

15   get four guys def.  And are they going to have

16   instructions on which ATM to go to and also about how

17   much we're talking.  They are ready whenever you are.

18   The PIN will be written on each card?  Please explain

19   the process so I can relay it to them."

20         A.    Yes.

21         Q.    So this whole idea of soldiers and multiple

22   soldiers came from you or came from the defendant?

23         A.    Well, it was -- he, in that statement he was

24   asking me how many people to bring and looking for more

25   specifics.

```
 1          Q.   Okay.

 2               MR. HUFTALEN:  Nothing further.

 3               THE COURT:  The number of cards you came up

 4   with -- I want to preface by saying, look, this

 5   obviously was a successful operation and these questions

 6   aren't meant to suggest there was anything untoward, it

 7   appears to the Court to be a good faith investigation

 8   and was conducted pretty effectively, but I have some

 9   questions about how you came up with a couple of things.

10               It seems to me the goal was to lure him up

11   here, to get his body into the state of New Hampshire;

12   right?

13               THE WITNESS:  That's correct.

14               THE COURT:  All right.  The idea of 200 cards,

15   how do you get the 200?

16               THE WITNESS:  I had possession of 200 pieces

17   of white plastic, and it would have been harder to get

18   more.

19               THE COURT:  I see.  Okay.  So if you had a

20   hundred, it would have been a hundred?

21               THE WITNESS:  It needed to be enough to be

22   enticing, but not enough to be an over-the-top amount

23   that wouldn't be believable.

24               THE COURT:  I get you.  I mean, where do you

25   put 200, was 200 at the limit or could it have been four
```

```
1   and still have been attractive, do you have any idea?

2           THE WITNESS:  Usually ATM cashouts are a lot

3   more cards than 200.

4           THE COURT:  So you could have gone higher?

5           THE WITNESS:  I could have.

6           THE COURT:  Okay.  But you had 200 and that's

7   how you got it?

8           THE WITNESS:  About 250 and --

9           THE COURT:  You picked a round number.

10          THE WITNESS:  Correct.

11          THE COURT:  Now, the lists of ATMs you

12  generated, same question.  How did you come up with the

13  length of those lists, the number of target ATMs?

14          THE WITNESS:  I looked at ATMs in the

15  Manchester area that would have been easy to surveil and

16  chose those as the first ones, and then just went down

17  other ATMs that were not ATMs that would cause concern

18  if they happened to go to the second or third one to

19  look.  It would have been an attractive ATM to do a

20  cashout.

21          THE COURT:  Okay, so it sounds like two

22  components.  One that, cites that were easy to setup on

23  for you guys to watch.  And number two, ones that would

24  not arise suspicion on the part of the defendant and his

25  group.
```

```
 1                THE WITNESS:  That's correct.

 2                THE COURT:  Okay.  That was my questions.  Any

 3      follow-up from either side based on that?

 4                MR. HUFTALEN:  Not from me.  Thank you.

 5                MR. LOTHSTEIN:  Not from me.  I just had a

 6      recross question.

 7                THE COURT:  That's fine.

 8                MR. LOTHSTEIN:  If I could just approach.

 9                THE COURT:  Sure.

10                      RECROSS-EXAMINATION

11      BY MR. LOTHSTEIN:

12           Q.    So, when Attorney Huftalen asked you a

13      question about an email dated the 24th about soldiers, I

14      just want to make sure we have the order correct.  As I

15      read it, you tell me if I'm wrong, you wrote:  "Doing

16      cashout next week, need some soldiers, big money, you

17      in?"  And he's the one who responded:  "Yes, I'm in.

18      Where they doing it.  How much are we looking at.  How

19      many soldiers do you need?"  Okay?

20           A.    Okay.

21           Q.    Is that correct?

22           A.    It is correct.

23                THE COURT:  Okay, I want to make sure I

24      followed that, counsel.  So what are you trying to

25      establish here?
```

```
 1              MR. LOTHSTEIN:  It's --

 2              THE COURT:  I understand what you're both

 3    trying to do.  What do you think that was?

 4              MR. LOTHSTEIN:  Well, it's just that the way

 5    it came out from Attorney Huftalen it could have caused

 6    confusion that it -- I don't want you to think that Mr.

 7    Adekoya was the one who came up with using multiple

 8    soldiers.  The way it was framed to him was that he

 9    would need some soldiers.  So, no, the cross is about

10    whose idea this is, who really devised the scheme, and

11    so just --

12              THE COURT:  I understand, and you're both

13    trying to establish that, although it seems to be clear

14    that the number, the actual number of four, four, five,

15    came from the agent.  What you're talking about now is

16    the idea of multiple soldiers as an idea, a concept,

17    whose idea was that, and you're each trying to suggest

18    it was the other.

19              MR. LOTHSTEIN:  Right.

20              THE COURT:  Okay.  What do you want to say

21    about that?

22              MR. HUFTALEN:  No, I think the idea of

23    multiple soldiers came from Matt O'Neill.

24              THE COURT:  Yeah.

25              MR. HUFTALEN:  The number four came from the
```

1    defendant.  So I think he just had it backwards, but.

2           THE COURT:  Well, he asked about four, and the

3    agent said yes, right?

4           MR. HUFTALEN:  What he said was I can get four

5    def.  I assume that's definitely.

6           THE COURT:  Yeah.

7           MR. HUFTALEN:  Yeah, I can get four def.

8                       REDIRECT EXAMINATION

9    BY MR. HUFTALEN:

10       Q.   But in light of that and in light of your

11   question, we touched on this on your direct examination

12   when we first had this sentencing scheduled quite a

13   while ago, but can you explain for the judge, and not a

14   real lengthy process, how these ATM cashouts actually

15   work.  I mean you fashioned this upon something that was

16   ongoing in the real world that people in the underworld

17   knew about; right?

18       A.   Yes.

19       Q.   And in those scenarios there are multiple

20   people and multiple banks; right?

21       A.   Yes --

22          THE COURT:  I understand how they work.  What

23   I'm interest in knowing is what evidence is there, what

24   evidence is there that the defendant knew how they

25   worked.  Go ahead.

```
 1              MR. HUFTALEN:  Okay.

 2              THE COURT:  What evidence -- if you want to

 3    frame it differently, elicit it how you want, but I

 4    understand that the defendant had an appreciation they

 5    existed; right?

 6              MR. HUFTALEN:  Yup.

 7              THE COURT:  That's as far as you go in your

 8    papers.  You basically say, oh, he knew about these

 9    things, therefore, this makes it a realistic figure.

10    I'm not as persuaded by that unless what you tell me now

11    about how they work, or what you told me a little bit

12    last time, is something that the defendant really

13    appreciated.  I mean, he's guilty of the offense,

14    there's no question about that, jury found that.  We're

15    talking about sentencing now and scope and economic

16    loss.  And I don't know what evidence there is that the

17    defendant really understood the economies of scale and

18    how they operate in an operation like this.

19              So, what can you tell me about that?

20              THE WITNESS:  I specifically just said, I

21    believe, are you interested in ATM cashout, to which the

22    response was yes.  How many -- and I said I'm looking

23    for soldiers.  I had previously done substantively

24    similar ATM cashout lures in which only the defendant

25    that we had indicted arrived.  So at that point in time
```

1   I was not interested in having multiple people come, but

2   it was, my point was you, and then other people, not you

3   and --

4           THE COURT:  You just wanted him to be one of

5   the people.

6           THE WITNESS:  Correct.

7           THE COURT:  That's the bottom line.

8           THE WITNESS:  That's correct.

9           THE COURT:  Yeah.

10          THE WITNESS:  So, through the course of

11  discussing, laying out very particular details about the

12  ATM cashout, the questions that the defendant was

13  raising I thought were good questions.  Some showed

14  knowledge of ATMs.  Now, that could have been general

15  use of ATMs, but also the defendant targeting, I believe

16  saying hoping to get 900,000 to a million dollars, which

17  is on the low level of ATM cashouts but still

18  understanding that there is large money in them.  That's

19  why they are an attractive lure.  So we did have

20  probably an hour, hour and a half of discussions as to

21  who was going to do what and when, but I couldn't say

22  whether or not -- unfortunately I didn't ask have you

23  participated in one before.  So --

24          THE COURT:  It wasn't part of the game plan.

25          THE WITNESS:  Correct.

```
1              THE COURT:  Yeah, I mean, you had

2   investigative and enforcement goals.  And what we're

3   talking about now probably wasn't on your radar screen;

4   is that fair to say?

5              THE WITNESS:  Correct.

6              THE COURT:  Yeah.  All right.  Anymore

7   questions for the witness?

8                       RECROSS-EXAMINATION

9   BY MR. LOTHSTEIN:

10     Q.    Just to make sure that this is clear.  You're

11  the one in your false persona, you're the one who

12  brought up that it could be worth as much as 850 to

13  $900,000?  You're the one that put that number out

14  there, not Mr. Adekoya?

15     A.    I believe I might have mentioned an amount and

16  then he reiterated that amount a few times to me.  If

17  you say that I said an amount first, I probably laid out

18  a number of cards, a number of potential withdrawals

19  first, and then the defendant did the math.

20     Q.    Let me just look for the exhibit page, your

21  Honor.

22     A.    Sure.

23           (Pause.)

24     Q.    So, I'm going to show you an electronic scan

25  of Exhibit 22d, and this is September 30th of 2013.  And
```

1   Shawn Carter, who you believed to be Adekoya, wrote how

2   much are we looking at in total.  We will get things

3   done.  There will be four people in total.  I'm

4   currently looking for a fifth person now.  236 PINS in

5   total.  And I'm going to go back to that.  But your

6   response was last time we had 183 PINS and got 700,000

7   U.S. dollars.  Hope to get 850 to 900,000 U.S. dollars;

8   correct?

9        A.   Correct.

10       Q.   So it was Mr. Adekoya who asked how much are

11  we looking at in total and you who put out the number

12  900,000; correct?

13       A.   That's correct.  I'm not sure if that's the

14  first time we ever discussed dollar figures, but

15  specifically on September 30th that is 100 correct.

16       Q.   You're not going to be able right now show the

17  judge another time when it was Mr. Adekoya who came up

18  with 900,000; right?

19       A.   Probably not, no.

20       Q.   That was September 30th, so it was basically a

21  day or two before the actual operation; right?

22       A.   Yes.

23       Q.   And it was Mr. Adekoya there who is asking how

24  much are we looking at in total; right?

25       A.   Yes.

1          MR. LOTHSTEIN:  I don't have any further

2    questions, your Honor.

3          THE COURT:  Okay.  Give me a moment.  There's

4    sort of a lot of moving parts to this sentencing.  I

5    want to keep track of them.  Okay.

6          All right, you may step down.  Thank you.

7          MR. HUFTALEN:  I don't have any other

8    witnesses or any other evidence, judge.

9          THE COURT:  Thank you.  Do you have any

10   evidence you want to present?

11         MR. LOTHSTEIN:  No, your Honor.  Just

12   argument.

13         THE COURT:  All right.

14         MR. LOTHSTEIN:  When we get to that.

15         THE COURT:  Thank you for that.  All right,

16   did we go through the PSR and your objections at the

17   last hearing?  We didn't.

18         MR. LOTHSTEIN:  I don't believe so.

19         THE COURT:  All right, I guess it's time to do

20   that now.

21         All right, so, let's -- I mean, look, I've

22   read your correspondence with the probation officer.

23   I've read the addenda to the PSR based on the probation

24   officer's consideration of your objections and I've read

25   your sentencing memorandum.  So, I mean, I guess I will

 1    work through them in whatever order you would like.

 2             I think the one we should start with, though,

 3    is the economic loss figure as it pertains to the base

 4    offense level.  I think that's a good place to start.

 5             MR. LOTHSTEIN:  Great.  You asked about PSR

 6    objections.  Besides what you already have reviewed, I

 7    have nothing to add to that.  I would point out that --

 8             THE COURT:  Well, I don't even remember what I

 9    reviewed, so we've got to do it all over.

10             MR. LOTHSTEIN:  No, you said you reviewed the

11    objections that I made in writing.  I don't have any

12    additional objections.  I just have a factual point for

13    you that in my sentencing memorandum I said that the

14    person who didn't graduate from college in the family

15    was Mr. Adekoya's father.  It's a very minor point.

16    Remember his father is a cab driver.

17             THE COURT:  Yes.

18             MR. LOTHSTEIN:  Mr. Adekoya just corrected me

19    on that.  His father did graduate from college but

20    couldn't find a better job than cab driving in the

21    United States.

22             THE COURT:  I see.

23             MR. LOTHSTEIN:  I just wanted to correct that

24    factually, and that's it.

25             THE COURT:  Was he educated in Africa or the

1   United States?

2           THE DEFENDANT:  Nigeria.

3           THE COURT:  Nigeria.  Thank you.  Okay, so

4   economic loss.  You're arguing for -- just, by the way,

5   the PSR in paragraph 30, it references a loss figure

6   between 400,000 and a million, but the guideline

7   provision that it cites, I think it's just a typo,

8   Officer Benard, I think it's just a typo, references

9   2B1.1(b)(1)(E), and I think she meant to reference

10  (b)(1)(H), because that's the figure for 400,000.

11          PROBATION OFFICER BENARD:  That's correct,

12  your Honor.

13          THE COURT:  (b)(1)(E) just coincidentally is

14  the figure you're arguing for I believe, Mr. Lothstein,

15  that plus eight based on that 80,000 that Judge

16  Barbadoro found to be the case for the co-defendant.

17          MR. LOTHSTEIN:  Right.

18          THE COURT:  All right.

19          MR. LOTHSTEIN:  Yes.  I think a better way to

20  put it would be that I feel strongly it should not be

21  any higher than that.

22          THE COURT:  Understood.

23          MR. LOTHSTEIN:  Mr. Adekoya would like it to

24  be a zero intended loss because it was impossible, but I

25  don't agree that that's consistent with the way the

```
 1    guidelines is written, so the position I'm taking is it
 2    should not be any higher than the level that was used
 3    with all the other co-defendants, but specifically Mr.
 4    Adegbesan.
 5            THE COURT:  All right.  Hold on a minute.
 6    Now, so, just so you're clear, I think you are clear,
 7    Mr. Adekoya, your counsel is saying that the argument
 8    should be no more than 80,000 based on the
 9    co-defendants, and your opinion is that it should be
10    zero.
11            THE DEFENDANT:  Yes, because I read a bunch of
12    cases from the First Circuit and from 1999 I believe
13    upward the First Circuit as cited in Jones and Rubio and
14    numerous cases, I've seen a bunch of cases, and from
15    different circuits, I believe the way they interpret the
16    guideline, the Fifth Circuit is a case United States
17    versus Blood which the scheme had no possibility of
18    success.  The Court agreed.  The Court of Appeals said
19    this case never had an enhancement --
20            THE COURT:  I'm aware of that case law.
21            THE DEFENDANT:  So, I've sent my attorney a
22    bunch of, I sit in the law library all day long trying
23    to, you know, there's nothing else to do in the jail, so
24    I gave him a bunch of cases on the Fifth, Fourth,
25    Seventh, Tenth Circuits.  A lot of circuits apply
```

Case 1:23-cr-00491-DOL    Document 646-1    Filed 10/10/25    Page 31 of 93

31

1    economic reality, and there's a case from the Sixth

2    Circuit, I believe, <u>United States versus McBride</u>, where

3    a scheme was obviously doomed to fail and the Court of

4    Appeals said, you know, even though the scheme was

5    doomed to fail, that doesn't mean it should be reduced

6    to a zero, but a judge can depart downward because the

7    offense level overstates the seriousness of the crime

8    because the scheme was doomed to fail.  In this case I

9    did not devise a scheme, you know, so, we argued this

10   numerous times --

11           THE COURT:  You said in this case I did not

12   devise a scheme?

13           THE DEFENDANT:  I didn't devise a scheme.

14           THE COURT:  So you're saying that it's zero

15   because you're innocent.

16           THE DEFENDANT:  I mean, I don't think the

17   Court would agree with it being zero because the

18   guidelines and commentary says intended loss can be a

19   loss that's not possible in the guidelines, the way the

20   guidelines is written, so I don't know what the Court

21   would do.  I mean, in my opinion I don't feel this

22   scheme had any possibility of, you know, even if it was

23   completed --

24           THE COURT:  I just want to understand your

25   argument so I can consider it, and I think I do.  Are

```
 1   you saying that, because you just said I did not devise
 2   the scheme, are you saying that the economic loss is
 3   zero because you didn't devise a scheme at all?
 4             THE DEFENDANT:  Because the scheme had no
 5   prospect for success which the First Circuit adopted --
 6             THE COURT:  Oh, it's not that you didn't
 7   devise a scheme, it's just the scheme that was devised
 8   had no prospect for success.
 9             THE DEFENDANT:  Yes, and I didn't devise the
10   scheme also, your Honor, because it's clear from all
11   this stuff my lawyer has filed, this scheme was just a
12   scheme in order to lure me to New Hampshire, which
13   didn't work.  So, I was not the one that came about this
14   plan at all.  So, you know, he could lie and say 600
15   cards, and those 600 cards put the intended loss at $3
16   million the way, you know, the intended loss has been
17   calculated, which would, you know, 300, 600 cards, I
18   will be looking at 20 years, I'll be spending 20 years
19   in jail for, you know, so I'm not saying that the
20   intended loss be reduced to zero because I don't think
21   the Court would agree with that, so I just feel like if
22   the intended was reduced to 80,000 which is used for the
23   co-defendants, I will deal with that and I preserve my
24   right to appeal that on appeal.
25             THE COURT:  Appeal what?
```

```
 1              THE DEFENDANT:  To challenge the intended loss
 2   being used.
 3              THE COURT:  Challenge what?
 4              THE DEFENDANT:  To challenge the intended loss
 5   of 80,000.
 6              MR. LOTHSTEIN:  You can't appeal until the
 7   judge makes his decision.
 8              THE COURT:  Yeah, well, I just need to know
 9   what number do you want me to use?
10              THE DEFENDANT:  Well, I can't really, you
11   know, tell you what number to use, your Honor --
12              THE COURT:  That's exactly what -- your lawyer
13   is telling me, your lawyer is telling me you shouldn't
14   go above $80,000.  That's certainly the limit.  What do
15   you say?
16              THE DEFENDANT:  I mean they used the intended
17   loss for the other --
18              THE COURT:  What are you saying?  What number?
19              THE DEFENDANT:  I say the Court should adopt
20   $80,000.
21              THE COURT:  All right, thank you.  That's how
22   we do it.  It's a lot easier if you just tell me what
23   you want me to do and I'll listen to you if I have
24   question, but it works.
25              MR. LOTHSTEIN:  I feel much better now, your
```

Case 1:23-cr-00491-DNL   Document 646-1   Filed 10/16/25   Page 34 of 93

34

1   Honor, because now we're in sync, so now I will

2   affirmatively request that you choose that particular

3   guideline.

4          Let me just tell you, first of all, the points

5   of law that we think control this.  One is the First

6   Circuit in United States versus Innarelli.  I'm just

7   going to read you the legal standards.  Quote,

8   notwithstanding, this is the First Circuit speaking:

9   "Notwithstanding the guidelines commentary's use of the

10  word intended, we focus our loss inquiry for purposes of

11  determining the defendant's offense level on the

12  objectively reasonable expectation of a person in his

13  position at the time he perpetrated the fraud, not on

14  his subjective intentions or hopes."  Okay, so that's

15  the first point.

16         And then a legal standard that we think is

17  relevant is from the United States versus Jones, which

18  is the First Circuit in 2008.

19         THE COURT:  Quick interruption.  Officer

20  Benard, does your PSR have a section on co-defendants?

21         PROBATION OFFICER BENARD:  Yes, your Honor.

22         THE COURT:  What page?

23         PROBATION OFFICER BENARD:  In the beginning of

24  the report, page --

25         THE COURT:  Oh, I see it, yeah, on related

```
1   cases?

2           PROBATION OFFICER BENARD:  Yes.

3           THE COURT:  Did you do a guideline, not a

4   guideline, but a sentencing synopsis?

5           PROBATION OFFICER BENARD:  Yes, it's at the

6   last sentence of what each defendant received for

7   sentences, the last sentence of each of their

8   paragraphs.

9           THE COURT:  Hold on a minute.  Then I will let

10  you continue.  Just give me a minute, Mr. Lothstein.

11          MR. LOTHSTEIN:  Sure.

12          THE COURT:  I'm sorry, what page is it on?

13          PROBATION OFFICER BENARD:  Page four,

14  paragraph 11.

15          THE COURT:  Oh, right there.  Sorry.  Just

16  give me a moment.

17          (Pause.)

18          THE COURT:  Okay.  Go ahead.  I'm sorry.

19          MR. LOTHSTEIN:  Okay, your Honor.  So, the

20  second point of law was the United States versus Jones,

21  First Circuit in 2008, and the quote is:  "As this Court

22  has previously stated we will uphold intended loss

23  determination whether it's good evidence of actual

24  intent and some prospect of success," and I take away

25  from there some prospect of success.
```

```
1              Now, this is obviously a sting operation so
2    I'm assuming that in this type of case some prospect of
3    success means some prospect of obtaining $88,000 or
4    obtaining $900,000 or obtaining $960,000 which is the
5    PSR's number.  And then finally from the United States
6    versus, this is just law that's known to all of us, I
7    have a case in the Fifth Circuit, but this is very
8    basic, the intended loss for any particular co-defendant
9    is a two prong analysis.  The scope of criminal activity
10   the defendant agreed to jointly undertake and then
11   consider all the reasonable foreseeable acts and
12   occasions of others in the jointly undertaken criminal
13   activity.
14              So, we think that's important because Mr.
15   Adegbesan has been sentenced.  The PSR recommended that
16   he be in that 88,000, you know, the intended loss be
17   88,000 --
18              THE COURT:  Hold on.  Officer?
19              PROBATION OFFICER BENARD:  I just want to
20   interject.  That actual presentence report, the officer
21   who wrote that report held him accountable for $960,000.
22              THE COURT:  Adegbesan?
23              PROBATION OFFICER BENARD:  Correct, the
24   probation officer, but the judge --
25              THE COURT:  And the judge went to 80,000.
```

1          PROBATION OFFICER BENARD:  Exactly.

2          THE COURT:  Thank you.

3          MR. LOTHSTEIN:  Okay.  So, your Honor, that's

4    something I can't know because I can't look at other

5    co-defendant's PSR, but I was under the impression that

6    that was the probation recommendation.

7          So, in that case the Court, another judge in

8    this court determined that there would be a four level

9    enhancement --

10         THE COURT:  Actually eight levels.

11         MR. LOTHSTEIN:  The eight level enhancement --

12         THE COURT:  Under 2B1.1(b)(1)(E).

13         MR. LOTHSTEIN:  The much lower enhancement,

14   your Honor, okay.

15         THE COURT:  Lower than 14 for sure; right?

16         MR. LOTHSTEIN:  Whatever is his reason -- you

17   know, Mr. Adegbesan is the person who, who's the only

18   person that can actually determine how much money would

19   be taken.  Okay.  Another judge determined what was

20   reasonably foreseeable to Mr. Adegbesan and what was the

21   scope of criminal activity undertaken by Mr. Adegbesan

22   was an $88,000 intended loss.  In terms of what can

23   actually be accomplished here, there's no possible way

24   for a person in New Jersey to have a larger number than

25   that.  Mr. Adegbesan is the one who's actually directing

1  people on the ground and a court found that his intended

2  loss was 88,000.

3         I just did a little cross-examination that it,

4  the point of it is it illustrates obviously, your Honor,

5  that this scheme was almost entirely devised not by Mr.

6  Adekoya but by Special Agent Matt O'Neill, but for all

7  the different parts of it to work Mr. Adegbesan has to

8  be on board.  He's the one who had Banks rent cars.

9  He's the one who had Banks arrange air flights.

10 Adegbesan is actually the one who recruited two of the

11 co-defendants, and then one of them recruited another.

12 If you look at who recruited who, according to the

13 evidence at trial, Mr. Adekoya --

14         THE COURT:  Yeah, but you're asking me to pick

15 up Judge Barbadoro's figure which is 88,000.

16         MR. LOTHSTEIN:  Right.

17         THE COURT:  Which at some level has real

18 appeal to me, but you're basically asking me to

19 disregard Judge Barbadoro's opinion that clearly

20 Adegbesan was inferior in the hierarchy to your client.

21         MR. LOTHSTEIN:  Yes, I guess I am doing that,

22 yes, your Honor, that's true.

23         THE COURT:  Well, isn't there some

24 inconsistency there that would suggest maybe I not do

25 that?

```
 1              MR. LOTHSTEIN:  Well, I think he would be
 2   inferior in terms of, I believe you're referring to
 3   inferior in terms of the managerial role, and that's not
 4   what we're arguing right now.
 5              THE COURT:  That's a good point, okay.
 6              MR. LOTHSTEIN:  We're arguing intended loss
 7   right now.  And for that one I argue that the only loss
 8   that can occur is what Adegbesan chooses to have occur
 9   and what Adegbesan intends, because the other person is
10   just behind a computer in New Jersey.
11              So, if you look at Adegbesan's role in terms
12   of intended loss, then some of the things he did, not
13   Adekoya, he's the one who collected 200 plastic cards,
14   Adekoya obviously collected zero.  He's the one who
15   maintained possession of 120 of them.  He's the one who
16   divided the cards with the other co-defendants.  He's
17   the one that would have given them instructions how much
18   to withdraw, what ATMs to go to.  And apparently he gave
19   an instruction to Mr. Banks or Mr. Banks believed he was
20   instructed that the whole operation had to end at 3 a.m.
21              So those are the constraints on this.  The
22   constraints are set by Adegbesan.  They're not set by
23   Adekoya.  So I don't believe there's an inconsistency
24   when I say that they shared the same managerial role and
25   a judge has agreed to that, that's fine.  When I say
```

1   that they share the same intended loss, there's not an

2   inconsistency there because in terms of an intended

3   loss, Adegbesan's really in charge of that.  And anybody

4   who's in Mr. Adekoya's shoes would understand that, that

5   ultimately that the only person to determine how much

6   money really is obtained here is Adegbesan.

7          THE COURT:  That sounds like, though, if I'm

8   to accept that kind of logic, it would suggest that, you

9   know, somehow that, I don't know, the leader or the

10  chief of a Columbian drug cartel is less culpable than

11  his people on the ground in places like Florida and

12  Texas.  That isn't the way the law works.

13         MR. LOTHSTEIN:  If you're jumping ahead to the

14  managerial role, that is a legal argument for --

15         THE COURT:  Keep it on the idea of quantity.

16  Whether we're talking about drugs or money, it's

17  quantity; right?  And you're saying that, well, whoever

18  is on the ground closest to the action is the one that

19  controls all these factors, and there's some truth to

20  that, but in calculating economic loss or drug quantity

21  I don't know any precedent for the idea, I'd like you to

22  point to me some, because I'm not aware of any precedent

23  that suggests that quantity is more attributable to

24  people lower in the hierarchy, managerial hierarchy than

25  any people higher in the hierarchy.  It's about

1    foreseeability, not about control.

2              MR. LOTHSTEIN:  Right, it's so different

3    because the cartel director has a number of people who

4    are selling and then each one is much less culpable in

5    terms of drug quantity.  Here it's really just a one to

6    one relationship, okay, the jury has found that Mr.

7    Adekoya is sitting behind a computer in New Jersey and

8    Adegbesan is running it on the ground, okay, there's not

9    other henchmen, okay, there's not other people who are

10   doing --

11             THE COURT:  Of course there are.  There's the

12   other two gentlemen that were so unfortunately caught up

13   in this.

14             MR. LOTHSTEIN:  Right, but there are not other

15   ATM cashouts in other locations like a drug cartel.

16   Whatever Adegbesan does, that is the amount of money

17   that Mr. Adekoya can obtain, the end.  I mean, it's not

18   a situation where it's other people that Adegbesan

19   doesn't know about who might collect more for him like a

20   drug dealer.

21             THE COURT:  Okay.  I think I misunderstood

22   your argument, and I actually shouldn't have because you

23   told me 88 is the number.

24             MR. LOTHSTEIN:  Eighty-eight is the number.

25             THE COURT:  If 88 is the number, you're saying

1    they're the same.

2          MR. LOTHSTEIN:  Yes.

3          THE COURT:  And I thought for a minute you

4    were starting to suggest that maybe Mr. Adekoya was less

5    culpable than, less culpable in terms of quantity than

6    Adegbesan.  You're not saying that.  You're saying

7    they're the same.

8          MR. LOTHSTEIN:  The same.

9          THE COURT:  All right.

10          MR. LOTHSTEIN:  Saying they're the same.

11          THE COURT:  Anything else on this point before

12    I hear from Mr. Huftalen?  We're going to do these one

13    at a time.  It's the only way to do it to keep it

14    straight.

15          MR. LOTHSTEIN:  One of the things that shows,

16    the problem here in terms of the reliability of what the

17    Court's doing is how many different methodologies you've

18    received now.  I mean, the PSR told you -- the actual

19    methodology as I understand it, again, I wasn't present

20    for Adegbesan's sentencing hearing, the actual

21    methodology used was there's 200 cards, there's $400 per

22    ATM withdrawal.  There was an assumption made there

23    about limits.  And that 200 times 400 is $80,000 and

24    that led to the eight level increase.

25          So basically the fundamental assumptions made

43

1   with Mr. Adegbesan is that each card would be used in

2   one ATM.

3          Then we get to Adekoya, and the PSR here

4   recommends that we should multiple 200 cards times $400

5   per withdrawal times 15 ATMs.  So, now we have a

6   methodology that's telling you that you should assume

7   that these co-defendants would take all 200 cards and

8   visit and make 15 withdrawals with each card, and that's

9   how you get to $960,000.  It's a 12 increase intended

10  loss compared to what Mr. Adegbesan was held accountable

11  for.  Only Mr. Adegbesan could really actually decide

12  and his co-defendants how many ATMs they will visit, but

13  the idea of 15, your Honor, is not realistic, okay, it's

14  not realistic.  If I go back to those legal standards

15  that you have to look at the objectively reasonable

16  expectation of the participants, not the subjective

17  hopes, the government wants to point you to one text

18  message where Mr. Adekoya allegedly parrots what had

19  been told to him by Special Agent O'Neill had said:

20  "Baba, this is supposed to be a 900K job."  This is a

21  text message sent after the fact when all these people

22  are actually busted, although the sender of the text

23  message would not know that, but this is after the fact

24  or during it, and it's in the context of the email that

25  you heard read to you where Special Agent O'Neill gave

 1    him those numbers, 850 to $900,000.

 2           It's not practical, okay, it's not objectively

 3    reasonable to think that these people in a strange state

 4    are going to take these cards, 200 of them, and run each

 5    one through 15 different ATMs.  It's not only not

 6    practical, it verges on preposterous because we all know

 7    that there's a daily limit.  Whether it's 400 or 2,000

 8    or some other number, you can't just take an ATM card

 9    and go from ATM to ATM and withdraw the maximum amount.

10           So, for the 15 times to be reasonable, then it

11    would have to be 15 days, okay.  And that's not

12    objectively reasonable.  In fact, as you heard, it was

13    Banks' impression that the whole thing had to be done by

14    3 a.m., and that is a number, two hours and

15    fifteen minutes basically of ATM visits that's

16    completely inconsistent with getting $900,000.  So, it's

17    not objectively reasonable.

18           Recognizing this the government had given you

19    a sentencing memorandum that calls for a completely

20    different methodology.  But all these methodologies are

21    flawed in that they're not objectively reasonable.  I

22    guess as a backup argument, your Honor, even if you

23    found, this is more of a departure argument than setting

24    an intended guideline, so I might be skipping ahead here

25    in our process, but even if you found that the PSR

```
 1    methodology is wrong and you found that the government

 2    methodology is right, we would argue that you then would

 3    have to grant a downward departure to avoid unwarranted

 4    sentencing disparity, because if the only reason that

 5    Mr. Adegbesan has 88,000 is that a different judge used

 6    a flawed methodology, it really will cause unwarranted

 7    sentencing disparity for you now to use a different

 8    methodology in the same case, finding a much higher

 9    number, and use that as a basis for the guidelines.

10           So, I don't want to repeat myself, but

11    basically what I'm saying is if you disagree with me,

12    then we're asking you to grant a departure downwards to

13    get back down to the equivalent of 88,000 to avoid

14    unwarranted sentencing disparity.

15           THE COURT:  A departure or a variance?

16           MR. LOTHSTEIN:  Well, we would argue that you

17    should do it as a departure to avoid unwarranted

18    sentencing disparity and that if you don't find that it

19    fits that, you should do it as a variance to avoid

20    unwarranted sentencing disparity.

21           THE COURT:  Okay.

22           MR. LOTHSTEIN:  That's I think just about all

23    I want to say about intended loss.  Do you want me to

24    address other arguments now or --

25           THE COURT:  No, I want to hear from Mr.
```

1  Huftalen.  This is the one issue that I think is pretty

2  important, and then the other, I want to give him a

3  chance to be heard about it.

4          MR. LOTHSTEIN:  So, in conclusion the 900K

5  comes from a text message.  It's the number planted in

6  the defendant's mind by the special agent who really

7  devised this entire scheme.  It would be flawed to rely

8  on that because you're looking at someone's subjective

9  intentions or hopes, and again, under the United States

10 versus Innarelli, you have to look at the objectively

11 reasonable expectation of a person, and these numbers

12 are too high in terms of objectively reasonable

13 expectation.  And that's it.  Thank you.

14          THE COURT:  Mr. Huftalen.

15          MR. HUFTALEN:  Thank you, judge.  I want to

16 posit a question.  If it was reasonable for people, the

17 defendant included, to believe that the person on the

18 other end, Agent O'Neill, could change the PIN numbers,

19 then it was reasonable for them to think that the person

20 on the other end, Agent O'Neill or Hieu Minh Ngo, could

21 change the withdrawal limits.

22          If the Court, and it seems to me that the

23 Court is inclined to adopt the $80,000 that Judge

24 Barbadoro found, and I think the 960,000 in the PSI in

25 that case is the same amount that's in this case, so

1   we're comparing apples and apples.

2          I want to point out that there was a

3   fundamental flaw in that analysis.  It was based upon

4   what the probation officer told the Court, and the

5   government didn't correct it because the government

6   wasn't aware of it at the time, that the withdrawal

7   limits for the two banks involved were 400 and 600.  I

8   filed a very brief supplemental memo and Agent O'Neill

9   testified at the last sentencing hearing with respect to

10  that issue, and although that has some superficial

11  appeal and it may well be why it didn't jump out at me

12  when I got the PSIs in the other case, that I should

13  question that.  It's not the fact.  The withdrawal

14  limits are set by the account that's being accessed, not

15  the machine through which it's being accessed.  And when

16  the probation officer, and you may recall Agent O'Neill

17  testifying to this, when the probation officer spoke to

18  St. Mary's Bank and the other bank, the name of which

19  escapes me now, they learned that that bank has limits

20  of, those banks have limits of 400 and 600.  And I think

21  the Court did in that case what it does in most cases

22  and frankly what I think most government lawyers do and

23  say if you're going to use a number, err on the side of

24  the defendant and use the lower number.  So we took that

25  400, multiplied it by the cards.

1          I'd point out that during Agent O'Neil's

2    direct testimony he spoke about communications between

3    the defendant and himself where Agent O'Neill threw out

4    the $2,000 and immediately the defendant came back and

5    said that must be a corporate account, which suggested

6    strongly that the defendant understood that ATM limits

7    can be significantly higher.

8          There's an exhibit that was admitted during a

9    sentencing the last time we were here, which is

10   Exhibit 22i, in which the defendant is talking about

11   taking out $2,000 for each card.  And he talks about

12   cards 2K each, five people -- he has the math wrong --

13   but he's talking about $2,000 per card per person who

14   has cards.

15         So, in actuality, if you were going to adopt

16   what Judge Barbadoro did, I think the math doesn't come

17   out to 80,000, it comes out to 400,000.  So instead of

18   an eight level enhancement, it's actually a 12 level

19   enhancement if my math is right.  Seventy to 120, 70,000

20   to 120 results in an eight level enhancement which is

21   what Judge Barbadoro found under subsection E.  One

22   hundred twenty to 200 is a 10 level, and 200 to 400 is a

23   12 level enhancement.  So assuming that Judge

24   Barbadoro's methodology was appropriate, taking into

25   account the factually incorrect information that he was

49

1  provided with, the same math comes out to 400 today, not

2  80.  And I'm not saying that Judge Barbadoro would have

3  adopted 400.  It may have been a number that was

4  convenient, not that he would be inclined to say that,

5  but I want to point out to the court that that was based

6  upon an assumption that was incorrect.

7          THE COURT:  I see.

8          MR. HUFTALEN:  So, I'm not going to stand here

9  and argue for the $960,000.  It seems pretty clear the

10 Court isn't going that way, but I do think that $80,000

11 is too low.

12         THE COURT:  Yeah.

13         MR. HUFTALEN:  And I think his intention and

14 his subjective intention was that he could have these

15 guys pull out a couple of thousand dollars with each

16 card.

17         THE COURT:  What's the number you argued for

18 on your supplemental brief when you corrected the

19 record?

20         MR. HUFTALEN:  I said $3,000 per card because

21 Wells Fargo has a $3,000 limit, but upon reviewing what

22 the defendant had said, and he spoke of 2,000, and I'm

23 lowering my request to $2,000 per card -- let me see

24 here.  (Pause.) I'd ask for 400 to a million saying that

25 if you used 3,000 --

```
 1              THE COURT:  You said the range is the same, I
 2   get it.
 3              MR. HUFTALEN:  But I think in light of the
 4   defendant's own statements, about $2,000, that's
 5   probably a more fair number to use or fair number for me
 6   to argue for than the Wells Fargo limit of $3,000.
 7              THE COURT:  I see.  All right.
 8              MR. LOTHSTEIN:  Could I just say one thing in
 9   response to that, your Honor?
10              THE COURT:  If you think you need to.
11              MR. LOTHSTEIN:  Okay.
12              THE COURT:  Go ahead.  Go ahead.  I'm
13   listening.
14              MR. LOTHSTEIN:  It's just that that doesn't
15   take into account the 30 percent that wouldn't work.  So
16   even by, you know, every time you look at it there's
17   another thing that you could factor in and plug in that
18   shows every liability involved.
19              THE COURT:  Of course.  Here's the problem.
20   It's what I'm going to do.  Actually, I think in terms
21   of the merits, in terms of a rational approach to this,
22   not the U.S. Attorney's original argument, but their
23   supplemental argument makes the most sense.  It does.
24   That said, I feel boxed in by the Adegbesan sentence.  I
25   just do.  I don't feel like I'm boxed in as if it's
```

Case 1:23-cr-00491-MAD   Document 649-1   Filed 10/30/25   Page 51 of 93

51

1   binding precedent, but I think it eliminates a lot of

2   problems to address these two defendants at roughly the

3   same level.  I mean, it's just, it eliminates lack of I

4   think sentencing issues that go to fairness.  And I

5   guess what I'm saying is even if I didn't apply the

6   eight level enhancement for 88,000 rather than the 14

7   level for something between 400 and a million, I would

8   frankly account for it with a variance anyway.  I would

9   do it one way or the other.  That's my inclination as to

10  what's just under these circumstances.  It ends up

11  inuring to this defendant's benefit in a way he doesn't

12  deserve, and I recognize that, but I nonetheless come

13  out there.

14          So, whether I get there from an eight level

15  enhancement under 2B1.1(b)(1)(E) or I go with (b)(1)(H)

16  as urged by the PSI and the U.S. Attorney and then vary

17  it after down to the same thing, that's where I'm going

18  to wind up.  So, that's what's going to happen on

19  economic loss.  On economic loss.  Okay.

20          Now, so that was your first objection to the

21  PSR.  What's your next one you want to address?

22          MR. LOTHSTEIN:  Well, I raised the issue of

23  managerial role, but we will stand on the pleadings on

24  that one, your Honor, unless you have questions for me,

25  I'd just like to stand on the pleadings.

52

```
 1              THE COURT:  If I understand your point you
 2   think it ought to be a three level adjustment, not a
 3   four.
 4              MR. LOTHSTEIN:  Correct.
 5              THE COURT:  And you think it ought to be a
 6   four?
 7              MR. HUFTALEN:  I think the leader of the
 8   cartel, to grab your analogy, is further up the food
 9   chain.
10              THE COURT:  Okay, and I think -- there's no
11   question about that.  I do think the Court is well
12   within its rights to give the four level adjustment.
13   Here's my question, though, and this is about what's
14   just.
15              It does seem, I want to be careful saying this
16   because I thought this was a, you know, a pretty good
17   operation that was designed to lure somebody, but that's
18   the problem with this, is that the numbers were not
19   driven by a scheme that was meant to generate economic
20   loss by anybody really.  The scheme was meant by a hard
21   working agent trying to get someone up to New Hampshire
22   so he didn't have to deal with a lot of bureaucratic
23   nonsense or expend resources to go arrest him.  But it
24   was about a lure.  It wasn't about a caper.  And there's
25   a difference there.  There's a difference as I wonder,
```

1   and how does it play out with this particular question?

2   Well, they're throwing numbers back and forth at each

3   other and having a conversation about it.  We had a

4   little chicken and egg conversation about whose idea was

5   multiple soldier and what was the number.  It doesn't

6   seem to me that this agent had some kind of -- he

7   certainly wasn't engaged in any kind of sentencing

8   manipulation on money or on soldiers.  That's clear.  I

9   mean, this was an appropriate investigative enforcement

10  effort.  But when you're weighing the balance of it on a

11  pretty draconian adjustment anyway, whether it's three

12  or four, why wouldn't I go with three from the

13  standpoint of justice?

14          MR. HUFTALEN:  Because if you feel boxed in by

15  what Judge Barbadoro did, Judge Barbadoro said certainly

16  Mr. Adekoya is higher up on the food chain, I'm going to

17  give him three.

18          THE COURT:  I have read your brief, by the

19  way, but you didn't cite anything.  Is that really what

20  the judge said?  Because I'm wondering about that.

21          MR. HUFTALEN:  I won't quote him, but there

22  was reference made to your defendant being higher in the

23  organizational structure, yes, there was.  And if you

24  were to go back and read that transcript, you'd see that

25  the three levels was a hard fought issue, and finally

```
 1    the judge said, all right, you're right.  I'm going to
 2    give him the three.  You've shown me it is.
 3    Congratulations, you won the battle, you lost the war.
 4    Here's the sentence.  But he did it because the facts
 5    warrant it and the facts here warrant it.  I appreciate
 6    what you said about Agent O'Neill, sincerely I do
 7    appreciate that because all too often people talk about
 8    what people do in the abstract and inferences can be
 9    drawn that aren't intended.  But as you started to speak
10    I immediately thought of entrapment, and you sort of
11    went that say and said no, no, no, it was fine, even if
12    it's an entrapment issue, is it outrageous government
13    conduct and was the defendant not predisposed.
14         THE COURT:  It was a lure, and frankly there
15    was another case going on that was, if I remember right,
16    was pending for a while; right?
17         MR. HUFTALEN:  It was identity theft fraud.
18         THE COURT:  But it was a real case, and
19    frankly, anything to get him into New Hampshire would
20    have facilitated that enforcement effort and that seems
21    to me to be the type of thinking that goes on here when
22    we were talking dollars and participants.  It wasn't
23    really about a tight little viable well-planned well-
24    executed economic caper.  It was about presenting it in
25    a way that would maximize the likelihood of Mr. Adekoya
```

1    coming to New Hampshire.  And I asked the agent about

2    that.  He didn't try to, you know, he didn't try to

3    fudge it.

4            MR. HUFTALEN:  This agent won't fudge anybody,

5    whether it hurts him or helps him, he tells you the

6    truth.  I know that and I suspect you do as well.

7    Believe it or not, this was the easier trial than the

8    other one, which is why we ended up charging and going

9    to trial on this one.  The other one is still hanging

10   out there.

11           THE COURT:  I gathered that.

12           MR. HUFTALEN:  Mercifully maybe that will

13   never come back.  But I think if the Court is really

14   inclined to follow the lead from down the hall, then I

15   think necessarily a four level enhancement here is, I

16   shouldn't say necessarily, I think a four level

17   enhancement here is appropriate under any circumstances,

18   but certainly in that scenario as well.

19           THE COURT:  Okay.  What's your next objection?

20           MR. LOTHSTEIN:  It relates to the departure

21   for partially completed offense, your Honor.  And in

22   response to our argument about this, the government has

23   cited a case on United States versus Carrington, First

24   Circuit, 1996, and it says that we misunderstood the

25   guideline, that under Carrington this guideline only

56

```
1   applies to basically attempt type cases, cases where the
2   offense was substantially completed, and the government
3   says here the offense was completed.
4            What we think the government is overlooking is
5   that in Carrington the defendant was, it was a wire
6   fraud case, and he was convicted under an actually
7   completed wire fraud, and the court said to distinguish
8   2X1.1 to rule it not applicable, the court says that
9   Carrington was convicted of wire fraud, not attempted
10  wire fraud or wire fraud conspiracy.
11           Our argument is that in this case we have
12  someone who is convicted of a conspiracy and an attempt
13  crime.  If you look at the bank fraud statute --
14           THE COURT:  No -- in your case or in that
15  case?
16           MR. LOTHSTEIN:  In our case.
17           THE COURT:  No.  Here we have -- no, there's
18  attempt here.  This was conspiracy and bank fraud;
19  right?
20           MR. LOTHSTEIN:  But the definition of bank
21  fraud that the jury had to rely on was a person who,
22  quote, attempts to execute a scheme to defraud.
23           THE COURT:  But that's the statute.
24           MR. LOTHSTEIN:  Right.
25           THE COURT:  So that's bank fraud.
```

Case 1:23-cr-00491-MAD    Document 649-1    Filed 10/30/25    Page 57 of 93

57

1      MR. LOTHSTEIN:  So our argument is --

2      THE COURT:  Wait a minute.  But he wasn't

3  charged with attempted bank fraud.  He was charged with

4  bank fraud.

5      MR. LOTHSTEIN:  But in this type of a case you

6  wouldn't be charged with attempted bank fraud because

7  attempt is built into the statute.  It's built in.  And

8  so we're arguing that because this statute has an

9  attempt built in that this is a partially completed

10 offense.  From the standpoint of logic it's a partially

11 completed offense although only because of, well, for

12 two reasons; one, it's impossible, but more important

13 the government orchestrated it and stopped it as a card

14 was going into an ATM; from our standpoint, point of

15 logic, it's a partially completed offense because this

16 is an attempt crime not according to a statute called

17 attempt but in accord with the definition of a crime,

18 the element that the jury convicted here, that you

19 should apply 2X1.1 and grant a departure on that basis.

20      So we disagree about -- it's a very

21 complicated and confusing rule -- we disagree about its

22 application and we disagree about the impact of a

23 Carrington decision.

24      THE COURT:  I admit I was struggling with the

25 legal analysis on this one a bit.  It's your point, Mr.

58

1  Huftalen, right, is that look, there's two counts.

2  Conspiracy count, which would implicate 2X1.1, but

3  there's a substantive account, right, which would not

4  implicate that guideline because it's the completed

5  substantive offense.

6          MR. HUFTALEN:  Actually what it said is they

7  both were completed.  The conspiracy was completed

8  before anybody got into New Hampshire.

9          THE COURT:  That's true, but there's a

10  guideline on conspiracy, 2X1.1; right?  See, that's my

11  point.  Conspiracies are completed crimes.  They're

12  inchoate, but they're completed.  And I actually have

13  more difficulty with the argument that defense counsel

14  makes here because I just don't quite understand it.  I

15  mean, a conspiracy to commit a crime is a crime.  And I

16  guess what you're saying is the departure, there's a

17  specific way that this departure operates, right, about

18  regarding three levels, the greater of three levels or,

19  you know, it's a very specific operation.  Seems to me

20  it should be a relatively simple question about whether

21  it applies here or not, but it's not clear to me.

22          It doesn't sound like anybody is going to tell

23  me either from what I can gather here.

24          MR. HUFTALEN:  Well, as I put in my memo, I

25  mean, it's been on the books for 13 years and there

```
 1    isn't a case on it that I could find certainly not in
 2    the First Circuit probably because a conspiracy is
 3    completed upon the completion of the first overt act and
 4    it's a completed offense, so how can it be a partially
 5    completed offense if it's a completed offense.  And the
 6    bank fraud, as you instructed, you instructed with
 7    respect to the first prong and the second prong, and
 8    neither of them included this as an attempt.  It was
 9    devise a scheme, you act with intent -- I paraphrase
10    greatly here -- the bank fraud's completed.
11              THE COURT:  So the jury instruction on Count
12    One didn't include the word attempt?
13              MR. HUFTALEN:  The instructions for bank fraud
14    are on pages 13 and 14, and with respect to --
15              THE COURT:  Are those from this case, though,
16    or those what you got out --
17              MR. HUFTALEN:  Yeah, this is U.S. versus
18    Adekoya.
19              THE COURT:  Oh, you're looking at the
20    instruction, okay, sorry.
21              MR. HUFTALEN:  Yes, your instructions.
22    Financial institution that's federally insured,
23    defendant devised a scheme substantially as charged in
24    the indictment to defraud that institution --
25              THE COURT:  You have to slow down for the
```

```
 1    reporter.  She's struggling.

 2             MR. HUFTALEN:  Oh, I'm sorry.

 3             THE COURT:  You put it in your brief; right?

 4             MR. HUFTALEN:  Yeah, I think I did.

 5             THE COURT:  You did.

 6             MR. HUFTALEN:  But I guess to synthesize it,

 7    wire fraud, mail fraud, bank fraud smells, feels,

 8    sounds, looks an awful lot like conspiracy, but nobody

 9    calls it a conspiracy.  A scheme is an ongoing course of

10    events, and it lends itself to a lot of interesting

11    legal issues, but the scheme is completed whether

12    there's money taken from the bank or not.  And in this

13    case, I think the instructions given that are at pages

14    13 and 14 --

15             THE COURT:  Right, they are on page five of

16    your brief, but it says the word attempt in it, okay,

17    but what I'm trying to figure out, did 2X1.1 exist for a

18    reason, all right, it exists for a reason and there's

19    specific instructions about how to apply it.  And you're

20    telling me it doesn't apply because bank fraud subsumes

21    the concept of attempt.  It's completed if it's

22    attempted.  It's a completed substantive offense.

23             MR. HUFTALEN:  If you devise a scheme, yes.

24             THE COURT:  Or attempt to devise a scheme.

25    That's what the instruction says.
```

```
 1              MR. HUFTALEN:  You're looking at it now?  I'm
 2   looking at the instructions and the handwritten notation
 3   7/16 12:34 p.m.  I think I have a draft.  I apologize.
 4              THE COURT:  Well, I'm looking at your brief
 5   and I'm relying on your brief.  It's fine.  It's fine
 6   with me.  The point is that the substantive offense of
 7   bank fraud is committed by its own definition by an
 8   attempted bank fraud, and devising a scheme, to me it's
 9   basically conspiring, if you're devising it with one
10   other person you're conspiring.  There's no difference.
11   It's not the same as actually obtaining funds or
12   property.
13              So, it's inchoate -- it can be committed in an
14   inchoate way and I don't feel like we've got to the
15   heart of it is what we're saying in the law you
16   presented to me.  Give me a moment.
17              (Pause.)
18              THE COURT:  What do you want to say, Mr.
19   Adekoya?
20              THE DEFENDANT:  I have about ten case laws
21   about how 2X1.1 should apply because I guess my attorney
22   did not even know this when he filed the objection to
23   the PSR, I brought this to his attention, I have a bunch
24   of cases on my USB program right now, and if you search
25   those cases on Westlaw, I have about ten case laws where
```

1   2X1.1 need to apply in this case, bank fraud case, I

2   have about ten cases on my USB right now.

3           THE COURT:  I've read those cases.  What do

4   you want me to do?  What are you trying to say to me?

5           THE DEFENDANT:  No, I'm just, you know, that

6   2X1.1 apply because the crime was not completed in this

7   case.  It was a partially completed offense because when

8   those guys picked up the package from the hotel, they

9   drove to the ATM.  Immediately when they got to the ATM,

10  they were arrested.  And in cases, 2X1.1, there was a

11  case that I found where this guy tried to withdraw

12  $800,000 in the scheme, the court applied 2X1.1 because

13  it was a partially completed offense because he was

14  planning on stealing 800,000 and was only able to get

15  $30,000 out.

16          THE COURT:  I think, look, I think you're

17  right about one thing, I think there are district courts

18  that have applied the 2X1.1 under circumstances like

19  this.

20          THE DEFENDANT:  Yeah.  And I have appellate

21  court cases also from the Fifth Circuit, Fourth,

22  Seventh.

23          THE COURT:  This is in your brief somewhere --

24  there it is.  It's on page 12.

25          THE DEFENDANT:  There's no case law cited in

 1    there though.

 2            THE COURT:  Right.  Well, look, I've been

 3    letting you -- I've been letting you argue for yourself

 4    this whole case and file things.  If there was something

 5    you wanted me to read, you could have filed it.  I've

 6    been allowing it right along.

 7            THE DEFENDANT:  I didn't know I could file

 8    stuff in this case, but I have this case law if my

 9    lawyer wants to review it real quick, so.  He's looking

10    for it now.  I mailed it to him.

11            THE COURT:  The application note does say --

12            MR. LOTHSTEIN:  That's what I'm looking at

13    right now, your Honor.

14            THE COURT:  Let's not talk out loud.  When we

15    have something to say, we're all looking at this, if you

16    have something to point me to, point me to it and I'll

17    read it.

18            Okay, let me see here.

19            (Pause.)

20            THE COURT:  All right, if you look at the

21    application notes under this guideline, it says

22    application note four:  "In certain cases the

23    participants may have completed or have been about to

24    complete but for apprehension or interruption all of the

25    acts necessary for the successful completion of a part

1   or not all of the intended offense."  That's not this

2   case, I don't think, unless you're arguing that the

3   first ATM withdrawal would have been part but not all of

4   the offense.  I don't think that's not what that means,

5   though, I don't know.

6           Continuing with the note:  "In such cases the

7   offense level for the count is whichever of the

8   following is greater, the offense level for the intended

9   offense minus three, or the offense level for part of

10  the offense for which the necessary acts were completed

11  or about to be completed."  So, it gives an example:

12  "Where the intended offense was the theft of 800,000 but

13  the participants completed or about to complete only the

14  acts necessary to steal $30,000, the offense level is

15  the offense level for the theft of 800,000 minus 30."  I

16  mean, that could apply to this case.

17          Now, so, that to me suggests that could apply

18  to this case.  You read the next part, though, it says

19  background:  "In most prosecutions for conspiracy or

20  attempts, the substantive offense was substantially

21  completed or was interrupted or prevented on the verge

22  of completion by the interception of law enforcement

23  authorities or the victim."  Right?  "In such cases no

24  reduction for the offense level is warranted."  That

25  would suggest not to apply this departure.  Although --

65

1    yeah, I mean -- my strong feeling about this guideline

2    is that we're not understanding it here because it

3    either applies to this situation or it doesn't.  There's

4    a parenthetical, okay.  2X1.1, the very title:

5    "Attempt, solicitation or conspiracy not covered by a

6    specific offense guideline."  This case is covered by a

7    specific offense guideline.  (Pause.) You know, I don't

8    think this applies.

9            Look, I think we can chase our tails on this,

10   all right, but if -- look, it's either 2X1.1(b)(1) for

11   attempt under the theory I guess that the jury may have

12   found, may have convicted him of an attempt under that

13   language in the jury instruction which include the word

14   attempt, it did; or B, the conspiracy count, Count Two,

15   because that was a conspiracy count, okay.  But it says,

16   decrease by three levels unless, I'm reading from 2X1.1

17   -- 2X1.1(b)(1).  If an attempt that, arguably Count One

18   in this case, decrease by three levels unless the

19   defendant completed all of the acts the defendant

20   believed necessary for successful completion of the

21   substantive offense, he did, or the circumstances

22   demonstrate that the defendant was about to complete all

23   such acts but for the apprehension or interruption by

24   some similar event beyond his control.  It did.  So I

25   think the unless, the unless clause here takes this case

66

1    out of this departure.

2         Now, looking at 2X -- I don't want to talk

3    over you there, I mean, I'm trying to talk to your

4    lawyer and work through this, all right.  I don't know

5    how else to do it.  If we did this hearing the way you

6    want to do, Mr. Adekoya, it would literally take months

7    because you want to talk to me about ten cases you found

8    that you didn't bring them with you.  I know those

9    cases.  I've read the cases.  I understand how this

10   works.  I'm trying to figure out if it applies to this

11   case, not how those cases work.  I know how those cases

12   work.  What?  No, sit down, sit down.  I'm still on the

13   guideline.  2X1.1(b)(2), if a conspiracy decrease by

14   three levels, right, Count Two is a conspiracy, unless

15   the defendant or a co-conspirator completed all of the

16   acts the conspirators believe necessary on their part

17   for the successful completion of the substantive offense

18   or the circumstances demonstrate that the conspirators

19   were about to complete all such acts but for

20   apprehension or interruption.  That's this case, okay?

21   Whether it's an attempt or a conspiracy, the unless

22   clauses of this guideline seem to take this case out of

23   this departure.  That's my sense.

24        Now look, cross reference, you know, when an

25   attempt -- C, 2X1.1(c)(1), cross-reference:  "When an

Case 1:23-cr-00491-DNL   Document 648-1   Filed 10/16/25   Page 68 of 93

1    attempt, solicitation, or conspiracy expressly covered

2    by another offense guideline section, apply that

3    guideline section."  I think that also applies in this

4    case.

5            I don't think 2X1.1 applies in this case.

6    That's the Court's ruling.  The application note's kind

7    of muddied up for me, they do, I admit, because they

8    contain some language that suggests that it might apply

9    in this case, but under the straight guideline, under

10   the straight guideline language I can't see how it

11   applies in this case.  I think the unlesses take the

12   case out.

13           Do you have an argument for me, Mr. Lothstein?

14           MR. LOTHSTEIN:  I don't, your Honor.

15           THE COURT:  All right.

16           MR. HUFTALEN:  Could I say one thing, judge?

17           THE COURT:  Of course.

18           MR. HUFTALEN:  Earlier I spoke without looking

19   at my memo, and I shouldn't have with respect to this

20   issue, and this is irrelevant to your determination.  I

21   had said this particular provision has no case law in

22   the First Circuit in the last 13 years.

23           THE COURT:  Yeah.

24           MR. HUFTALEN:  I shouldn't have said that.

25   That's not factually correct.  With respect to the

1  economic reality doctrine which we may get to, I will

2  raise that, which I have at page eight of my memo, I

3  apologize for speaking too loosely.

4          THE COURT:  Let me ask the officer.

5          PROBATION OFFICER BENARD:  Yes, your Honor.

6          THE COURT:  You didn't apply this departure.

7  You didn't apply this guideline.  What was your

8  thinking?

9          PROBATION OFFICER BENARD:  With the conspiracy

10  count we normally do dictate I would have applied the

11  cross reference to start at 2X1.1, 371 convicted

12  offense, you start at 2X1.1 and then cross out to the

13  substantive offense.

14          THE COURT:  Under (b)(1)(1)(c); right?

15          PROBATION OFFICER BENARD:  Exactly.

16          THE COURT:  So you cross referenced out to

17  what?

18          PROBATION OFFICER BENARD:  I did 2B1.1 for the

19  bank fraud.

20          THE COURT:  Okay.  All right, Mr. Lothstein,

21  what's your next objection to the PSR?  Go ahead, Mr.

22  Lothstein.

23          MR. LOTHSTEIN:  Well, some of them are moot if

24  you're going to apply the eight level, the 88,000.

25          THE COURT:  Tell me which ones are moot so I

```
 1   won't address them then.

 2              MR. LOTHSTEIN:  Like no prospect for success

 3   departure --

 4              THE COURT:  I won't address that, then.

 5              MR. LOTHSTEIN:  -- is moot, okay.

 6              THE COURT:  You mean the one we just did?

 7              MR. LOTHSTEIN:  No.

 8              THE COURT:  Okay.

 9              MR. LOTHSTEIN:  This is not the X.

10              THE COURT:  There are no prospects for

11   success.

12              MR. LOTHSTEIN:  Right, right.

13              THE COURT:  Okay.

14              MR. LOTHSTEIN:  Economic reality doctrine, I

15   don't think it's relevant if you're going to go to

16   88,000.

17              THE COURT:  Understood.

18              MR. LOTHSTEIN:  Okay, so I believe that's

19   moot.  A variance for unwarranted sentencing disparity,

20   no longer an issue, okay, at least in terms of that

21   88,000.

22              THE COURT:  At least in terms of the loss

23   calculation.

24              MR. LOTHSTEIN:  We're still talking about

25   guideline calculations at least in terms of that.  And
```

```
 1    those are all my objections I believe.
 2              THE COURT:  All right.  Mr. Huftalen asked,
 3    has a request, though, for an upward variance.
 4              MR. HUFTALEN:  Upward departure.
 5              THE COURT:  Upward departure?  Yeah.
 6              MR. HUFTALEN:  Pursuant to 4A1.3.  I have
 7    nothing to add to that other than what is in the papers.
 8              THE COURT:  Yeah.  It's an interesting
 9    argument.  Your point, if I understand it correctly, is
10    that look, there's criminal history here that the
11    guidelines don't seem, the Criminal History Category
12    don't seem to account for; right?
13              MR. HUFTALEN:  Exactly, yes.
14              THE COURT:  Yeah.  You want to be heard about
15    that one, Mr. Lothstein?
16              MR. LOTHSTEIN:  Just that we object to that,
17    your Honor.  It's speculative.  We don't know what's
18    going to happen in New Jersey.  Mr. Adekoya could move
19    to withdraw his plea.  But more importantly the
20    government is asking to rely on basically a prosecutor's
21    prediction.  A New Jersey prosecutor has told Mr.
22    Huftalen what she wants to ask for and what she thinks
23    she's going to get, and that's, you know, I don't know
24    how much you know about the New Jersey state courts and
25    typical sentencing there, I don't know anything, so I
```

1  can't tell you that what she's saying is wrong, I just

2  think that as a federal judge in Concord, New Hampshire,

3  it would be inappropriately speculative to --

4       THE COURT:  You doubt my encyclopedic

5  knowledge of New Jersey state practice?

6       MR. LOTHSTEIN:  Exactly.  You might be able to

7  rely on it, but it would be inappropriate for you to

8  rely on just the representation of one prosecutor in New

9  Jersey of what she thinks she's going to get out of Mr.

10  Adekoya's hide at sentencing, that that's too

11  speculative to use as a ground for an upward departure.

12       THE COURT:  All right.  Okay.  All right, Mr.

13  Adekoya, you're allowed to speak at your sentencing.

14  What we have done so far, we have determined what the

15  guideline -- well, we haven't determined it yet, I'm

16  going to make some rulings about the guideline

17  sentencing range, then the departures, then the

18  variances.  But you also have a right to allocution

19  which means you get to speak.  This isn't necessarily

20  where you usually make legal arguments, but you can say

21  whatever you want.  Usually it's where you tell me

22  what's on your mind about this case and your conduct and

23  how you feel about things, but I imagine you've got some

24  legal arguments for me, so this is your opportunity to

25  say whatever you want.

```
 1              THE DEFENDANT:  First I will take probably ten

 2    minutes if you don't mind, your Honor, I don't know if

 3    that's the rule.

 4              THE COURT:  I'm not going to stop you.

 5              THE DEFENDANT:  I have it written down --

 6              THE COURT:  Here's what I ask.  When you, it

 7    looks like you have some prepared remarks, and that's

 8    fine.  I ask you to take your time and go slowly because

 9    the reporter has to type it.  If you get going too fast

10    it might be difficult, so please take it easy.

11              THE DEFENDANT:  All right.  The first one is

12    the parties stipulated at trial no banks were victimized

13    or exposed to a risk of loss.  The use of daily ATM

14    withdrawal --

15              THE COURT:  You're going way, way too fast.

16              THE DEFENDANT:  Oh, all right.  I'm sorry.

17    The parties stipulated at trial no banks were victimized

18    or exposed to a risk of loss.  The use of daily ATM

19    withdrawals must be supported by evidence.  The use of

20    aggregate withdrawal limit with plastic cards or

21    fictional PIN numbers is not supported by evidence.

22              THE COURT:  Slow down.  You want me to read

23    that instead?

24              THE DEFENDANT:  I would like to put this on

25    the record.
```

```
 1              THE COURT:  You want me to read it into the
 2   record?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  I'll do that.  You're just reading
 5   too fast for the reporter, that's all.  Whenever we read
 6   our own writing we all have a tendency to really fly.
 7              Okay.  This is Mr. Adekoya's allocution for
 8   the record.
 9              Bullet one.  The parties stipulated at trial
10   no banks were victimized or exposed to a risk of loss.
11   The use of daily ATM withdrawal limit must be supported
12   by evidence.  The use of aggregate withdrawal limit with
13   plastic cards and fictional PIN numbers is not supported
14   by evidence.  The cards should not be used to obtain
15   anything of value.
16              By the way, Mr. Huftalen, I assume you're
17   going to listen to this, and that if you have something
18   you disagree with here, you've got to tell me.  I'm not
19   -- there's a lot of bullets here.  I'm just saying that
20   I'm reading, these are his words, that's all.  If you
21   want to respond, you will have the opportunity.
22   MR. HUFTALEN:  Thank you.
23              MR. LOTHSTEIN:  Can I just ask a question,
24   your Honor.  Really this isn't an allocution.  This is
25   all points of law.  Is it possible for that just to
```

```
1    become a sentencing exhibit without having to read the
2    entire thing into the record?
3              THE COURT:  Well, I mean, it will be -- I will
4    read it, I promise you, Mr. Adekoya.
5              THE DEFENDANT:  Well, I want it put on the
6    record, your Honor.
7              THE COURT:  Here's what I will do.  We are
8    going to put it on the record.  Jadean, let's label this
9    Court's Exhibit 1, my exhibit, so I keep it in the
10   record.  I'm going to take a recess and read it all the
11   way through right now in chambers right here, and I will
12   come out and address, you'll know I read it because I'm
13   going to address certain points, all right?  And we're
14   going to enter it into the record so it's there if you
15   take an appeal, Mr. Adekoya, it will be part of the
16   record.  Do you understand?
17             MR. LOTHSTEIN:  Thank you, your Honor.
18             THE COURT:  I just want to be merciful here
19   for the -- do you have a copy for Mr. Huftalen?
20             MR. LOTHSTEIN:  I don't even have a copy for
21   me, your Honor.
22             THE COURT:  The Court will make a copy.
23             MR. LOTHSTEIN:  Thank you.
24             THE COURT:  Fifteen minute recess or however
25   long it takes me to read it.
```

```
 1                    MR. HUFTALEN:  Thank you.

 2                    (Recess taken.)

 3                    THE COURT:  All right, please be seated.  I

 4     have read Mr. Adekoya's allocution which has been marked

 5     as Court's Exhibit No. 1 and entered into the record.

 6                    It is, it's a list of bullet points over four

 7     pages, the majority of which, not all, but the majority

 8     of which are directed at the concepts of economic loss,

 9     intended loss, and the economic viability or possibility

10     of the scheme here to defraud.

11                    I have a few comments on a few of them.  On

12     the first one, the fifth bullet, it says intended loss

13     is always less serious than actual loss, and continued

14     on from there.  I think that's a good point and I agree

15     with it.

16                    The next bullet it says this was a clumsy,

17     almost comical, conspiracy to defraud non-existent bank

18     of $960,000.  I think, although I did not adopt that

19     number as the loss figure, I think that's basically an

20     admission that this was a conspiracy to defraud a bank

21     of almost a million dollars.  I didn't adopt that

22     number, but I think it pretty much estops the defendant

23     from making any argument at any time in the future that

24     that would have been an unreasonable figure, because the

25     fact it is a comical conspiracy or clumsy doesn't change
```

1    the fact that he's admitted there that it was a

2    conspiracy to defraud of $960,000.

3           It continues at the end of the same bullet it

4    says, quote, the District Court is treating this

5    pathetic crime as a million dollar fraud, et cetera, et

6    cetera, and it goes on.  Of course the Court is not

7    doing that.  It's doing quite the opposite.  If anything

8    it's treating the fraud of something less than what it

9    was by adopting a figure adopted by a judge in another

10   case.

11          The ninth bullet on page one is something that

12   the Court agrees with.

13          On page two, the third bullet, it starts off

14   that it is clear that a district court errs when it

15   simply equates potential loss with intended without

16   deeper analysis.  I think that's true.

17          MR. HUFTALEN:  Excuse me, judge.  I started to

18   write down, did you say second or third?

19          THE COURT:  Which page, just now?

20          MR. HUFTALEN:  Page two.  Third?

21          THE COURT:  Third.

22          MR. HUFTALEN:  I was on the wrong bullet.

23          THE COURT:  The next one, the next bullet,

24   bullet four says the Court is focusing on estimation of

25   loss that is not supported by the preponderance of

1    evidence standard used at sentencing.  Actually that's

2    not true.  The Court actually adopted the economic loss

3    figure advanced by the defendant, both by his counsel

4    and by he himself.

5            The third page, third bullet.  The third

6    bullet is one of many, many bullets here which

7    demonstrates the defendant's lack of understanding of

8    the law, of criminal law and criminal sentencing.  The

9    third bullet says, quote, the intended loss is not

10   supported by body of undisputed, reliable, and specific

11   evidence.  That is not a standard that this Court is

12   familiar with.  The idea that a loss figure or any

13   sentencing factor should be based on undisputed evidence

14   is unsupported by any precedent or authority I'm aware

15   of.

16           The sixth bullet on page three says the U.S.

17   Court of Appeals for the First Circuit has held that

18   Rule 32, et cetera, requires the District Court at

19   sentencing to rule on any disputed portion of the

20   presentence report or other controverted matter.  And as

21   you will see when I finish up with this, I will have

22   ruled on every disputed point in the PSR.

23           Finally, the last bullet on page three,

24   foreseeability may be established by a defendant's

25   knowledge of the nature and extent of a conspiracy in

78

1    which he is involved.  It is both good law and good

2    logic the defendant's awareness of the inner workings of

3    a conspiracy in which he is participating is germane to,

4    and often highly probative, of accomplice attribution.

5    Such knowledge will frequently suffice to prove the

6    defendant's ability to foresee the acts of

7    co-conspirators.

8            I think that is a true statement, but I

9    unfortunately think the defendant doesn't understand

10   that it actually cuts in favor of a more severe sentence

11   for him as opposed to a more lenient one.

12           Finally, the last two bullets on page four.

13   The defendant says, and this is finally the defendant

14   speaking I think from his heart a little bit as opposed

15   to sort of cutting and pasting boiler plate from other

16   cases and authority, he says it is my position that if

17   the Court were to increase the sentence based on

18   intended loss, not probable, it could be seen as a sign

19   of vindictiveness on part of the Court or on part of the

20   prosecution.

21           Well, whether or not it would be

22   vindictiveness, that's not what the Court intended to do

23   and nothing about the Court's loss finding would support

24   that type of conclusion.

25           The Court is not increasing the sentence based

1   on intended loss.  The intended loss is a greater figure

2   in this case than the figure the Court has found for

3   economic loss under the guideline.

4         Finally, a District Court is required, last

5   bullet, a District Court is required to state in open

6   court the reasons for its imposition of the particular

7   sentence, and of course the Court will do that.

8         All right, so, let's work through this

9   systematically now.  So it's clear -- oh, by the way,

10   that Exhibit 1 will be entered into the record so it

11   will be there for any future proceedings of Mr. Adekoya.

12         All right, the Court adopts the Presentence

13   Investigation Report in full with the following

14   exceptions:

15         Paragraph 30, the specific offense

16   characteristic based on economic loss.  The Court is

17   adopting not the guideline at 2B1.1(b)(1)(H) for between

18   400,000 and a million but rather the adjustment at

19   2B1.1(b)(1)(E) for over 80,000, the same number as Judge

20   Barbadoro applied in the Adegbesan case which was a

21   co-defendant to this case.  That was at 13-cr-110-1-PB.

22         The Court is primarily applying that for

23   consistency sake.  I think there is evidence that would

24   suggest a higher economic loss figure would be

25   defensible, but this eliminates any of the questions of

1    possibility, feasibility, likelihood of success, all

2    those, I think the defense counsel put it well when he

3    said it's moot, it renders those issues moot.  I know

4    it's not a conclusion that the prosecution in this case

5    is happy about, but what you should understand is if I

6    didn't apply this adjustment, I would certainly correct

7    it with a variance after the guideline calculation

8    anyway.  So, either way this Court was going to treat

9    this case as an $88,000 loss despite the number of cards

10   and ATMs involved.

11            The role in the offense, the Court is not

12   adopting the four level role in the offense at 3B1.1(a),

13   but rather the Court is adopting and applying the

14   adjustment at 3B1.1(b) for manager or supervisor, rather

15   than organizer or leader.

16            Now look, again, this is a situation where I

17   think the four level adjustment is defensible, but I'm

18   applying the three level for really the same reason.  I

19   think the defendant understood that there were five

20   people involved, including himself, but those numbers of

21   participants involved really was not, it was not

22   something that the defendant is -- not something the

23   defendant lacks any culpability for, but it just didn't

24   originate with him, and the fact that it originated with

25   the agent I don't think is, I don't think it is

1   something that the prosecution should be punished for or

2   anything or that the defendant should get credit for,

3   it's just that those numbers weren't driven by economic

4   conspiratorial factors.  It was just put together as a

5   lure.  There were forces driving this case that didn't

6   have anything to do with economics or size of

7   conspiracy.  Frankly, if that negotiation between the

8   agent and Mr. Adekoya had resulted in only Mr. Adekoya

9   coming alone, I think it would have been perfectly fine

10  for the purpose of this investigation and this

11  enforcement action.  So I don't think that the number of

12  participants in the conspiracy is important or really

13  makes any difference in this case.  And so, again, even

14  if I didn't apply the adjustment for three levels for

15  manager or supervisor as opposed to the four level

16  adjustment for organizer or leader, I would correct that

17  with a variance outside the guidelines after doing the

18  calculation.

19          Other than that, the Court adopts -- other

20  than those two adjustments and any mathematical

21  adjustments that flow down the page, the Court adopts

22  the rest of the Presentence Investigation Report in full

23  without exception.

24          That gives us -- oh, okay -- that gives us a

25  guideline sentencing range of 18 and a Criminal History

1　Category of II.  That yields, let me look that up, a

2　guideline sentencing range I believe of 30 to 37 months.

3　　　　　Now, I believe any -- the one -- any variances

4　or adjustment or any variances or departures that the

5　defense requested have been rendered moot by the ruling

6　on economic loss.  There's no sentencing manipulation

7　here and those others listed, likelihood of success and

8　incomplete crime have all been accounted for by that

9　economic loss finding as defense counsel pointed out.

10　　　　　There is, though, a request for an upward

11　adjustment, upward variance by the prosecution based on

12　the defendant's criminal record and underrepresentation

13　of his criminal record by Category II.  That's a tougher

14　question because I think it makes sense.

15　　　　　The problem is, some of the problem is what

16　defense counsel points out.  It's based partially on

17　conjecture, and the defendant has represented he's going

18　to withdraw guilty pleas in these cases and who knows

19　what's going to happen there.  I don't know New Jersey

20　law about the likelihood of success of those motions.

21　　　　　The fact is, though, the Court urged, urged,

22　that the defendant be processed on those cases.  This

23　Court does not like to sentence people for convictions

24　that have not been sentenced because they don't find

25　their way into the guideline calculation, and the Court

1    wants to sentence based on a real Criminal History

2    Category.  I realize that the New Jersey authorities

3    refused to issue writs of habeas corpus ad prosequendum

4    to finish those cases, and I realize there are some

5    constraints on the Executive Branch's ability here to

6    lawfully transport him to New Jersey to face those

7    charges.

8            But my view is, look, my view is pretty

9    simple.  I think it could have happened.  I don't cast

10   any aspersions on the prosecution or the enforcement

11   agency for not making it happen, but there are ways to,

12   in my view, if we wanted these prior crimes to be part

13   of the sentence considered in a sound solid way, it

14   could have happened by just cooperation between

15   agencies.  I've got to believe that there are people who

16   could have made this happen just by persuading

17   authorities in New Jersey to writ him out, but those

18   decisions were made and I think the chips are going to

19   have to fall where they may.

20           And so I'm not going to penalize the defendant

21   for, in ways the guidelines don't based on an upward

22   variance, or departure I should say, it's a departure

23   under, is it 4A1, Mr. Huftalen?

24           MR. HUFTALEN:  4A1.3.

25           THE COURT:  4A1.3.  So the Court declines to

1    do that.

2          So, the guideline sentencing range is, it's a

3    total offense level 18, Category II, 30 to 37 months.

4    The Court is going to sentence the defendant at the top

5    of the range, 37 months imprisonment.  He deserves every

6    month and every day of that sentence.  Many, many of

7    these decisions broke in his favor -- yes, counsel?

8          MR. LOTHSTEIN:  I was actually going to get

9    him to stand up because you're now pronouncing sentence.

10          THE COURT:  I'm not sentencing him yet.  I'm

11    just explaining the rationale.

12          The fact is, a three-year sentence plus a

13    month is a just sentence accounting for all the factors

14    in the federal sentencing statute.  It's a sentence

15    that's sufficient but not more severe than necessary to

16    meet the following purposes:

17          First, to reflect the seriousness of the

18    offense, promoting respect for the law, and providing

19    just punishment.

20          Second, it affords adequate deterrence to

21    criminal conduct.

22          Third, to protect the public from further

23    crimes of this defendant.  And I say that in the context

24    of what I think the defendant is facing in terms of his

25    pending state charges, which I hope will be completed,

1   and his likely deportation, which I see is all but

2   inevitable.  So I think a 37-month sentence is

3   sufficient to protect the public.

4          Fourth, to provide the defendant with any

5   correctional treatment in the most effective manner.

6          The Court has considered the defendant's

7   arguments and his request for variances based on various

8   factors all of which were either withdrawn or rendered

9   moot by the Court's rulings on economic loss.

10          The Court has considered the prosecution's

11   request for a variance based on purported

12   underrepresentation of his criminal history by his

13   Criminal History Category II.

14          But considerations of just punishment based on

15   the offense conduct and the defendant's history,

16   specific deterrence, respect for the law and public

17   protection predominate over all others, whether viewed

18   separately or collectively, thus making a variance

19   inappropriate in this case.

20          The Court has considered the following

21   statutory factors set forth at 18 USC Section 3553(a) in

22   imposing this sentence:

23          First, the nature and circumstances of the

24   offense.

25          Second, the history and characteristics of the

86

1  defendant.

2       Third, the kinds of sentences statutorily

3  available.

4       Fourth, both the kinds of sentences and the

5  advisory sentencing range established by the U.S.

6  Sentencing Guidelines.

7       Fifth, the policy statements issued by the

8  U.S. Sentencing Commission under the applicable

9  guidelines which the Court has reviewed and considered.

10      Six, the need to avoid unwarranted sentencing

11  disparity in situations involving similar conduct and

12  similar criminal records.

13      And seven, the need to provide restitution to

14  victims, which is not a factor in this case because

15  there was no actual economic loss.

16      The fact that the sentence is within the

17  applicable advisory guideline sentencing range insures

18  that the consideration of each factor, which the Court

19  has undertaken independently as well, is reflected by

20  the sentence.

21      What the Court did here was consider these

22  variances in light of the rather lenient guideline

23  rulings it made, two of which significantly cut in favor

24  of the defendant.  Had the Court applied those for the

25  prosecution, there likely would have been a variance in

87

1  this case to the same sentence of 37 months.

2       So, a sentence under these circumstances at

3  the high end of the guideline sentencing range is

4  sufficient but not more severe than necessary to

5  facilitate and serve the statutory and traditional

6  function of sentencing.

7       Are there any findings or rulings I haven't

8  made or any rationale I haven't explained to the

9  satisfaction of any of the parties or the probation

10 officer?

11      MR. LOTHSTEIN:  No, your Honor.

12      MR. HUFTALEN:  I understand the Court's

13 findings and rulings and I have no legal objections.

14      PROBATION OFFICER BENARD:  No, your Honor.

15      THE COURT:  All right.  Officer Benard, you

16 okay?

17      PROBATION OFFICER BENARD:  Yes.

18      THE COURT:  All right, I will impose sentence

19 then.

20      MR. HUFTALEN:  Excuse me, judge.

21      THE COURT:  I'm sorry, what?

22      MR. HUFTALEN:  Could I speak with Mr.

23 Lothstein just for one moment before you --

24      THE COURT:  Yes, of course.

25      (Pause.)

 1              MR. HUFTALEN:  Thank you, judge.

 2              THE COURT:  All right.  Pursuant to the

 3    Sentencing Reform Act of 1984 it is the judgment of this

 4    Court that the defendant, Oluwaseun Adekoya, is hereby

 5    committed to the custody of the Bureau of Prisons to be

 6    in prison for a term of 37 months on each of Counts One

 7    and Two, both such terms to be served concurrently.

 8              It is ordered that the defendant pay the

 9    United States a special assessment of $200 that shall be

10    due in full immediately.

11              The defendant does not have the ability to pay

12    a fine, so the Court will waive the fine in this case.

13              Mr. Adekoya, you have the right to appeal this

14    sentence to the U.S. Court of Appeals located in Boston.

15    Any appeal you take must be filed within 14 days of the

16    entry of judgment.  Do you understand?

17              THE DEFENDANT:  Yes, your Honor.

18              THE COURT:  All right.

19              MR. LOTHSTEIN:  Your Honor, I will be filing a

20    notice of appeal tomorrow, and I just want to bring

21    something to your attention.

22              Mr. Adekoya has asked me consistently for a

23    long time to move for bail pending appeal, but I don't

24    believe I can make that motion.  I believe that I cannot

25    meet the legal standard.

89

THE COURT:  I understand.  Look, Mr. Adekoya,
it's moot.  If I gave you bail, there is a detainer by
immigration customs enforcement.  It would attach and
you would be seized.  But I wouldn't grant it anyway.  I
mean, you are probably close to the last defendant I've
ever had that I would ever bail in this situation.  I
think you'd be gone and invisible within, I don't know,
20 minutes or so, so I can't imagine granting you bail.
I know you're going to tell me now that there's no
immigration detainer.  You've been telling me that for a
couple years now, but go ahead.

THE DEFENDANT:  I have a couple of my criminal
history the government provided to me in June before
trial.  That criminal history shows the only outstanding
warrant I have is for New Jersey, for Hudson County.  At
the jail where I am at Strafford County, I have
requested, I put in to the jail, they did an NCIC check.
The only warrants that I have is from Hudson County.
I'm out on bail on that charge.  The prosecutor issued a
detainer against me maliciously because I was being held
in federal custody.  If I was supposed to appear for a
sentencing hearing, she will issue a detainer on me that
I failed to appear for court.  So, I'm on bail on that
case.  I don't have any detainers.  I have a copy of the
criminal history which my lawyer can show --

```
 1                    THE COURT:  The criminal history that you're
 2        provided at the beginning of the case --
 3                    THE DEFENDANT:  This was in June.  This is
 4        after the detainer was issued.
 5                    THE COURT:  A criminal history generated by
 6        U.S. Probation generally wouldn't make any reference to
 7        an immigration custom enforcement detainer.  Those
 8        aren't criminal detainers.  They're administrative
 9        proceedings.  They're not usually on criminal records.
10                    THE DEFENDANT:  And also, your Honor, there's
11        also one reason why because I keep telling my lawyer
12        that the bail reform act, 18 USC 3143(b), which means on
13        appeal has to raise a question of law or fact.  One of
14        the specific cases is the FDIC insured status, that the
15        elements of the crime of bank fraud is to prove the bank
16        is insured.  There's a case from First Circuit 2000 --
17                    THE COURT:  I'm not saying you don't have an
18        appeal.  You'll get your appeal.
19                    THE DEFENDANT:  That's not even, the appeal
20        here raises a question of law or fact because one of the
21        FDIC insured --
22                    THE COURT:  So what?  When I ask you so what,
23        you're supposed to answer my question.  So what?  What
24        difference does that make?
25                    THE DEFENDANT:  If there's a question of law
```

1    or fact in the case the defendant is eligible to be

2    released on bail pending appeal.

3                THE COURT:  You're talking nonsense.  You're

4    talking nonsense.  Stop talking.  Seriously, you don't

5    understand the law.  I know you think you do, but you

6    don't.

7                THE DEFENDANT:  I would like to move for bail

8    pending appeal.  I would like my lawyer to file a motion

9    for it.

10               THE COURT:  Well, he won't file for it because

11   he has an obligation as an officer of the Court not to

12   file a motion that's meritless.  If he changes his mind,

13   though --

14               THE DEFENDANT:  So can I file the motion?

15               THE COURT:  You have a lawyer, no, you can't

16   file the motion.  The rules require you to be

17   represented by counsel.  That's why we have attorneys so

18   only motions that have some merit are filed.

19               Now, listen, your lawyer is a very careful

20   lawyer, and he obtained for you today a sentence that's

21   more lenient than you deserve, all right?  Rather than

22   continue to insult him, you might want to consult with

23   him and listen to his opinion, because he's given you

24   very good representation, all right?  There is almost no

25   way I could ever consider giving you bail.

1      THE DEFENDANT:  Well, if we have an

2 evidentiary hearing on bail pending appeal and it's

3 denied I'll appeal it to the Court of Appeals for the

4 First Circuit and let them decide, so that's what I'm

5 trying to do here, and I don't think I should be denied

6 that right to have an evidentiary hearing on the bail --

7      THE COURT:  If a motion is filed, we'll have a

8 hearing --

9      THE DEFENDANT:  I want my lawyer to file --

10      MR. LOTHSTEIN:  Thank you very much, your

11 Honor.

12      THE COURT:  We will have a hearing.  Mr.

13 Huftalen, do you want to say anything?  There's no

14 motion pending as far as I know.

15      MR. HUFTALEN:  Then in that case I have

16 nothing to say.

17      THE COURT:  All right.  I need to see counsel

18 just briefly, but it's on separate issues.

19      MR. LOTHSTEIN:  Okay.

20      THE COURT:  The prosecutor first.  Very

21 briefly, I promise.  And then defense counsel.

22      MR. LOTHSTEIN:  Okay, great.  Thank you, your

23 Honor.

24      THE COURT:  The defendant is remanded to the

25 custody of the U.S. Marshal.

```
 1              (Hearing concluded at 4:30 p.m.)

 2

 3

 4

 5

 6

 7              C E R T I F I C A T E

 8

 9         I, Sandra L. Bailey, do hereby certify that

10    the foregoing transcript is a true and accurate

11    transcription of the within proceedings, to the best of

12    my knowledge, skill, ability and belief.

13

14

15    Submitted: 5/8/2015

16

17              SANDRA L. BAILEY, LCR, CM, CRR

18              LICENSED COURT REPORTER, NO. 15

                STATE OF NEW HAMPSHIRE

19

20

21

22

23

24

25
```