**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

     **vs.**                                                                    **1:23-CR-491**
                                                                             **(MAD)**

**OLUWASEUN ADEKOYA,**

                           **Defendant.**
_____

**APPEARANCES:**                                   **OF COUNSEL:**

**OFFICE OF THE UNITED**                    **BENJAMIN S. CLARK, AUSA**
**STATES ATTORNEY**                          **JOSHUA A. ROSENTHAL, AUSA**
James T. Foley U.S. Courthouse              **MATTHEW M. PAULBECK, AUSA**
445 Broadway, Room 218
Albany, New York 12207
Attorneys for the United States

**OLUWASEUN ADEKOYA**
Montgomery County Jail
P.O. Box 432
200 Clark Drive
Fultonville, New York 12072
Defendant, *pro Se*

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On June 25, 2025, Defendant Oluwaseun Adekoya was convicted following a jury trial of

one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344(1) and (2); one

count of conspiracy to money launder in violation of 18 U.S.C. § 1956(h); and nine counts of

aggravated identity theft in violation of 18 U.S.C. § 1028A. *See* Dkt. No. 468.[1]  Defendant

_____

[1] Defendant was convicted of the charges alleged in the second superseding indictment, which the
Court will refer to as "the indictment" throughout this decision. *See* Dkt. No. 299.

represented himself, *pro se*, during the two-week trial, with Attorney Ryan Forbes appointed as stand-by counsel. *See* Dkt. No. 401; Text Minute Entry 06/02/2025. Attorney Julie Nociolo was appointed as stand-by counsel for the purpose of sentencing. *See* Dkt. Nos. 536, 537. Defendant was sentenced on December 1, 2025, to a total term of 240 months' imprisonment, consisting of 216 months on counts one and two, to run concurrently, and 24 months on counts three through eleven, to run concurrently with each other and consecutive to counts one and two. *See* Text Min. Entry, Dec. 1, 2025. The Court ordered Defendant to pay restitution in the amount of $2,261,754.06 jointly and severally with his Co-defendants. *See id.* Defendant filed a notice of appeal on December 4, 2025. *See* Dkt. No. 699. Judgment was entered on December 5, 2025. *See* Dkt. No. 698.

Presently before the Court are Defendant's seven post-trial motions, filed *pro se*, and the accompanying responses and replies. Defendant moves for release pending his appeal, *see* Dkt. Nos. 718, 731; to stay restitution payments pending appeal, *see* Dkt. Nos. 714, 728; for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, *see* Dkt. Nos. 496, 549, 585; for a new trial pursuant to Federal Rule of Criminal Procedure 33, *see* Dkt. Nos. 532, 610, 643, 650, 654, 689, 658, 693; and for the issuance of subpoenas and an evidentiary hearing, *see* Dkt. Nos. 658, 663. The Government opposes each motion.

For the following reasons, Defendant's motions are denied.

## II. DISCUSSION

### A.    Legal Standards

#### 1.  *Judgment of Acquittal – Federal Rule of Criminal Procedure 29(c)*

After a jury verdict, a defendant may challenge the sufficiency of the evidence presented at trial by moving for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c)(1).

FED. R. CRIM. P. 29(c)(1).  "A Rule 29 motion should be granted only if the district court concludes there is 'no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'"  *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

To be entitled to relief under Rule 29, a criminal defendant "must show that when viewing the evidence in its totality, in a light most favorable to the government, and drawing all inferences in favor of the prosecution, no rational trier of fact could have found him guilty."  *Irving*, 452 F.3d at 117.  The Court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others."  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

"'[T]o avoid usurping the role of the jury,' . . . [the court must] 'not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury.'"  *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted).  Thus, the court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence."  *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998).  The jury's verdict "may be based entirely on circumstantial evidence."  *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995); *see also United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002); *United States v. Arroyo*, No. 12-CR-552, 2013 WL 227733, *2 (S.D.N.Y. Jan. 22, 2013), *aff'd*, 600 Fed. Appx. 11 (2d Cir. 2015).

### 2.  New Trial – Federal Rule of Criminal Procedure 33(a)

Federal Rule of Criminal Procedure 33(a) provides, in pertinent part, that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

justice so requires." FED. R. CRIM. P. 33(a); *see also United States v. Ferguson*, 246 F.3d 129,

133 (2d Cir. 2001) (citation omitted).  "A motion for a new trial on the ground that the verdict is

contrary to the weight of the evidence raises issues different from those involved in a motion for a

judgment of acquittal based on the sufficiency of the evidence." *United States v. Nalbandian*, No.

3:08-CR-60, 2009 WL 5218056, *5 (D. Conn. Dec. 29, 2009) (citing *United States v. Martinez*,

763 F.2d 1297, 1312 (11th Cir. 1985)).  When reviewing a Rule 33 motion, a district court has

"broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived

miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  Though a

district court is entitled to "'weigh the evidence and in so doing evaluate for itself the credibility

of the witnesses,' it 'must strike a balance between weighing the evidence and credibility of

witnesses and not "wholly usurp[ing]" the role of the jury.'" *United States v. Triumph Capital

Group, Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (internal quotations omitted).

     Accordingly, a court should exercise its discretion under Rule 33 with caution and with

due respect for the jury's verdict.  *See id.*  Therefore, as the Second Circuit has explained,

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty
> verdict stand would be a manifest injustice.  The trial court must be
> satisfied that "competent, satisfactory and sufficient evidence" in
> the record supports the jury verdict.  The district court must
> examine the entire case, take into account all facts and
> circumstances, and make an objective evaluation.  "There must be a
> real concern that an innocent person may have been convicted."
> Generally, the trial court has broader discretion to grant a new trial
> under Rule 33 than to grant a motion for acquittal under Rule 29,
> but it nonetheless must exercise the Rule 33 authority "sparingly"
> and in "the most extraordinary circumstances."

*Ferguson*, 246 F.3d at 134 (internal citations omitted).

**B.**    **Analysis**

    *1.*  *Bail Pending Appeal*

Pursuant to 18 U.S.C. § 3143(b), the Court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal . . . be detained" unless a defendant establishes the following factors by clear and convincing evidence:

> (1) that he is not likely to flee or to pose a danger to the community[;]

> (2) that the appeal is not for the purpose of delay[;] [and]

> (3) that it raises a substantial question of law or fact likely to result in . . . a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process . . . .

*United States v. Zillgitt*, 17 Fed. Appx. 31, 33 (2d Cir. 2001) (summary order) (citing 18 U.S.C. §§ 3142(f)(1), 3143(b); *United States v. DiSomma*, 951 F.2d 494, 496 (2d Cir. 1991)) (spacing added) (quotation marks omitted).  "A 'substantial question' is 'a close question or one that very well could be decided the other way' on appeal."  *United States v. Sow*, No. 23-CR-593, 2025 WL 3214077, *1 (S.D.N.Y. Nov. 18, 2025) (quoting *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985)).  "This statutory guidance establishes a presumption in favor of detention." *United States v. Valdez*, No. 1:22-CR-551, 2025 WL 3552510, *1 (S.D.N.Y. Dec. 11, 2025) (quotation marks omitted) (quoting *United States v. Williams*, No. 22-CR-684, 2024 WL 4491492, *3 (S.D.N.Y. Oct. 15, 2024).  "[T]he burden of persuasion rests on the defendant to demonstrate each requirement of the test has been."  *Id.* (quoting *United States v. Menendez*, No. 23-CR-490, 2025 WL 1212152, *1 (S.D.N.Y. Apr. 25, 2025)) (quotation mark omitted).

Defendant argues that he is not a danger to the community, nor a flight risk, his appeal is not for the purpose of delay, and he has raised a substantial question of law or fact that is likely to result in acquittal or a new trial.  *See* Dkt. No. 718 at 3-4.[2]  Specifically, Defendant notes that he

---

[2] Citations are to the pagination generated by CM/ECF in the header of each page.

does not have a history of violent crimes, *see id.* at 2, and he has lived in the United States for twenty-five years with lawful permanent resident status since 2004. *See id.* at 27. As for a substantial question of law or fact, Defendant raises many of the arguments he presents to the Court in his motions for acquittal and for a new trial. *See id.* at 4-26.

The Government vehemently disagrees, arguing that Defendant has failed to prove by clear and convincing evidence that he is not a flight risk or danger to the community nor that his appeal raises a "substantial question." Dkt. No. 731.

The Court agrees with the Government. Defendant must prove all the factors set forth in § 3143(b)(1). The Court could deny his request for bail solely based on his inability to prove he is not a danger or the community or solely because he has not raised a substantial question on appeal. The Court's conclusion is strengthened by the fact that Defendant has failed to establish both.

As set forth in paragraphs forty-five to fifty-two of the final Presentence Investigation Report, Defendant has been convicted of fraud-related crimes since 2008. It appears that, as the Government states, "every single time the defendant has been released from custody, he has immediately returned to identity theft and fraud, utilizing increasingly sophisticated means to scale his crimes and conceal himself from law enforcement." Dkt. No. 731 at 4. "[T]he danger of economic harm may [] be considered by the court on a motion for release under § 3143." *United States v. Nicolo*, 706 F. Supp. 2d 330, 335 (W.D.N.Y. 2010) (collecting cases); *see also United States v. Adelekan*, No. 19-CR-291, 2022 WL 17968647, *2 (S.D.N.Y. Dec. 27, 2022).

Defendant has also been sentenced to a twenty-year prison term. "Courts in this Circuit have frequently concluded that the imposition of such a lengthy sentence, itself, may weigh in favor of finding that a defendant is more likely to flee than before learning of their sentencing

fate, as here." *United States v. Rahmankulov*, No. 21-CR-653, 2023 WL 3479696, *3 (S.D.N.Y.

May 16, 2023) (citing *United States v. Scali*, 738 Fed. Appx. 32, 33 (2d Cir. 2018)).

The Court also heard testimony that as part of the conspiracy, Defendant's "bank

managers" would recruit people with drug addictions to go into the financial institutions and

conduct fraudulent transactions.  Defendant, through his bank managers, would pay these

individuals a very small fraction of the proceeds or with drugs.  *See, e.g.*, Dkt. No. 677 at 70, 172-

73; Dkt. No. 679 at 30, 166-67.

Defendant has not convinced this Court that he poses no danger to the community just

because his criminal history is not violent.  He has demonstrated a consistent disregard for the

well-being of other people as shown by his decade-long stealing of others' identities and monies.

As to the substantial question factor, Defendant has failed to set forth a substantial

question of law or fact that is likely to result in a reduced sentence.  The Court will address each

of Defendant's specific arguments underlying his "substantial question" argument later in this

decision.

For these reasons, as well as the Court's subsequent conclusions related to the merits of

Defendant's arguments for a new trial and acquittal, his motion for bail pending appeal is denied.

### 2.  Restitution

Federal Rule of Criminal Procedure 38 "governs the stay of various aspects of a criminal

sentence, including criminal monetary penalties, such as fines and restitution imposed against a

defendant." *United States v. O'Sullivan*, No. 20-CR-272, 2023 WL 7110292, *7 (E.D.N.Y. Oct.

27, 2023).  Rule 38(e) states that "a district court 'may stay—on any terms considered

appropriate—any sentence providing for restitution under 18 U.S.C. § 3556 or notice under 18

U.S.C. § 3555.'"  *Id.* (quoting FED. R. CRIM. P. 38(e)(1)); *see also United States v. Chan*, No.

3:17-CR-234, 2018 WL 3031853, *5 (D. Conn. June 19, 2018); *United States v. Sow*, No. 23-CR-593, 2025 WL 3214077, *3 (S.D.N.Y. Nov. 18, 2025).

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of th[e court's] discretion." *Encarnacion v. Olivo*, No. 9:21-CV-986, 2024 WL 4651770, *10 (N.D.N.Y. Nov. 1, 2024), *reconsideration denied*, 2024 WL 5212772 (N.D.N.Y. Dec. 23, 2024) (citation and quotation marks omitted); *see Nken v. Holder*, 556 U.S. 418, 433-34 (2009). "The Court considers . . . four factors in determining whether to issue a stay[.]" *Encarnacion*, 2024 WL 4651770, at *10. The first two factors "are the most critical": (1) whether a defendant has made a strong showing that he is likely to succeed on the merits; (2) whether he will be irreparably harmed absent a stay; (3) whether a stay will substantially injure the other interested parties; and (4) the weight of the public interest. *Id.* (quoting *Nken*, 556 U.S. at 434.

As to the two most important factors, Defendant first argues he is likely to succeed on his appeal for the same reasons he delineated in his motion for bail and his motions for acquittal and a new trial. *See* Dkt. No. 714 at 2-3. He also states, generally, that he will be irreparably injured absent a stay because "recovered funds may be distributed to victims (or third parties) and cannot be returned cleanly, levy or garnishment may attach unique or nonreplicable assets (retirement accounts, home equity), and the practical ability to secure appellate relief will be frustrated." *Id.* at 3.

As to the other two factors, Defendant contends that Government has not "demonstrated that temporary preservation of funds during the limited time of appellate review will produce meaningful prejudice," and "[t]he public interest favors orderly appellate review and the finality of judgments after appellate consideration." *Id.* at 3-4.

The Government disagrees as to each factor.  The Government argues Defendant is unlikely to succeed on appeal, will not suffer irreparable harm absent a stay, a stay is premature and would harm other parties, and the public interest does not favor a stay.  *See* Dkt. No. 728.

The Court, again, agrees with the Government.  First, for the reasons explained later in this decision, Defendant is unlikely to succeed on appeal.  The Court finds none of his arguments for acquittal or a new trial meritorious; therefore, the first factor weighs against a stay.  Second, as the Government states, "courts have recognized that it is unlikely that a defendant will be 'irreparably injured' by the collection of restitution during the pendency of an appeal."  Dkt. No. 728 at 5 (collecting cases); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

The Court is mindful that "[a]s a practical matter, recouping the garnished funds . . . after they have been distributed to him would be difficult, if not impossible."  *United States v. Yalincak*, No. 05-CR-153, 2015 WL 6456537, *3 (D. Conn. Oct. 26, 2015) (granting a stay of restitution which remained in the amount of approximately one million dollars).  However, "the Court's restitution order provides for payment in monthly installments based on a percentage of his monthly income."  *United States v. Tagliaferro*, No. 19-CR-472, 2021 WL 5983126, *4 (S.D.N.Y. Dec. 17, 2021).  Specifically, the restitution payment schedule as stated in the Judgment mandates that "restitution is due immediately, with any remaining restitution payable at a minimal rate of 25% of the defendant's gross monthly income while incarcerated."  Dkt. No. 698 at 9.  Considering this payment schedule, combined with the lack of merit in Defendant's appeal, a stay of the restitution is not warranted.  *See United States v. Silver*, No. 15-CR-93, 2018

WL 4440496, *10 (S.D.N.Y. Sept. 17, 2018); *United States v. Pincus*, No. 19-CR-436, 2023 WL 3571218, *3 (E.D.N.Y. May 19, 2023).

Although the first two factors matter the most, the Court also notes that "delaying [] restitution payments will only harm [Defendant's] victims and postpone the public's interest in requiring wrongdoers to make their victims whole." *Rahmankulov*, 2025 WL 326495, at *6 (citing *United States v. Razzouk*, 11-CR-430, 2018 WL 3574868, *3 (E.D.N.Y. July 25, 2018)).

As such, Defendant's motion to stay restitution pending his appeal is denied.

### 3. *Venue*

The Court has addressed the issue of venue *ad nauseam*. The Court addressed venue in ruling on Defendant's motions *in limine*. *See* Dkt. No. 429. The Court addressed the issue in ruling on Defendant's Rule 29(a) motion at the close of the Government's case-in-chief at trial. *See* Dkt. No. 684 at 229, 245-52. The Court overruled Defendant on the issue, which he raised in nearly every single objection he made during trial. *See, e.g.*, Dkt. No. 667 at 40-41; Dkt. No. 678 at 255-60; Dkt. No. 679 at 40-41, 63-64, 208-09; Dkt. No. 680 at 33-34, 36-38, 40-41, 54-55, 171-73; Dkt. No. 682 at 52, 169-76, 199; Dkt. No. 683 at 100-01, 136-38, 144-45, 175-76, 192, 249-50, 293-96; Dkt. No. 684 at 3-5, 25-28, 32-33, 95-96, 177-80.

Defendant set forth his venue argument in his opening statement to the jury. *See* Dkt. No. 675 at 225-27. He told the jury that he "never set foot in this district. [He] never conducted any business here. [He] never driven anybody to any credit union in this district." *Id.* at 228. Defendant later, referring to himself in the third person, informed the jury that "[a]s the trial goes on, you will get to understand that Mr. Adekoya has never committed any crimes in this district. Mr. Adekoya did not send anybody to any banks in this district." *Id.* at 232-33. Defendant reiterated his arguments to the jury in his summation, repeating that "Mr. Adekoya committed no

act in furtherance of this district." Dkt. No. 563 at 89. Defendant asserted that he never directed any co-conspirators to come to the Northern District of New York, that none of the phone calls that were made to credit unions came into this district, and that he had never been to this district. *See id.* at 89-135. The jury rejected Defendant's arguments and found him guilty on all counts charged in the indictment. *See* Dkt. No. 468.

The Court, again, addresses the issue of venue herein and, consistent with each of its prior rulings and the jury's determination, finds that the Government established venue is proper in this district by a preponderance of the evidence and Defendant's motions on this ground are denied.

### a. Standard

"The Constitution twice safeguards the defendant's venue right . . . ." *United States v. Miller*, 808 F.3d 607, 613 (2d Cir. 2015) (quoting *United States v. Cabrales*, 524 U.S. 1, 6 (1998)). "Article III provides that '[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.'" *Id.* (quoting U.S. CONST. art. III, § 2, cl. 3). "And the Sixth Amendment directs that, '[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial[ ] by an impartial jury of the State and district wherein the crime shall have been committed . . . .'" *Id.* (quoting U.S. CONST. amend. VI). "These constitutional guarantees are reinforced by Rule 18 of the Federal Rules of Criminal Procedure, which directs that, '[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.'" *Id.* at 613-14 (quoting FED. R. CRIM. P. 18).

"The basic principles governing venue in federal prosecutions are well established." *United States v. Hwa*, 161 F.4th 127, 136 (2d Cir. 2025). "A defendant in a criminal case has the

right to be tried in the 'district wherein the crime shall have been committed.'" *United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021) (quoting U.S. CONST. amend. VI); *see* FED. R. CRIM. P. 18). "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue." *Chow*, 993 F.3d at 143 (alterations in original) (quoting *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985)). "Rather, venue is proper 'in any district in which such [an] offense was begun, continued, or completed.'" *Id.* (quoting 18 U.S.C. § 3237(a)). "However, venue must be proper with respect to each count." *Id.* (citing, *inter alia*, *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011)).

"As to a charge of conspiracy, venue is proper in the district in which the conspiratorial agreement was formed or in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators." *Hwa*, 161 F.4th at 136 (collecting cases). "The government has the burden of proving proper venue; but as venue is not an element of the crime, such proof need *only be by a preponderance of the evidence*." *Id.* (emphasis added) (citations omitted) (quoting *Chow*, 993 F.3d at 143).

In *Hwa*, the defendant challenged a conviction on a second superseding indictment based on the district court's denial of the defendant's lack of venue motion made against the first superseding indictment. *See Hwa*, 161 F.4th at 138. The Second Circuit questioned if the defendant's challenge on appeal "present[ed] a live issue" and held that the defendant's venue challenge could not "warrant reversal*." Id.*

Nevertheless, in discussing the district court's opinion, the Second Circuit stated certain legal principles that are applicable to this Court's present analysis. The Second Circuit, in its opinion dated December 6, 2025, explained that the district court "rejected [the defendant's] contention that venue is not proper in a district in which a defendant merely sent or transmitted

relevant items or information through it, noting that in conspiracy cases 'courts in this Circuit have routinely found that "passing through" a district is sufficient to confer venue.'" *Id.* at 136 (citations omitted); *see United States v. Kirk Tang Yuk*, 885 F.3d 57, 71-72 (2d Cir. 2018).  The Second Circuit reiterated that "venue is proper in *any* district in which an overt act in furtherance of the conspiracy has been committed by *any* of the coconspirators." *Hwa*, 161 F.4th at 137 (emphasis added).  The court also quoted the district court's "observ[ation] that 'venue will lie if a reasonable jury could find that it was "more probable than not" that the defendant "reasonably could have foreseen" that part of the offense would take place in the district of prosecution.'" *Id.* (citations omitted).  The Second Circuit affirmed the defendant's conviction.  *See id.* at 149.

In an unreported opinion dated nine days later, the Second Circuit affirmed another conviction and, in doing so, reiterated additional principles relevant to this Court's determination. *See United States v. Washington*, No. 24-3173, 2025 WL 3628306, *4 (2d Cir. Dec. 15, 2025). Specifically, the Second Circuit noted that "for healthcare fraud, 'all of the places that *any* part of [the healthcare fraud] took place' are 'appropriate' venues." *Id.* at *1 (alteration in original) (quoting *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015)).  "Similarly, venue for wire fraud 'lies where a wire in furtherance of a scheme begins its course, continues[,] or ends.'" *Id.* (citation omitted).  "Finally, the government need not 'show that a defendant had actual knowledge that particular acts would occur in a particular district[;] [r]ather, [we] ask[ ] whether the acts' occurrence in the district of venue would have been reasonably foreseeable to the defendant.'" *Id.* (alterations in original) (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)).

The Second Circuit restated its previous holding "that '[p]hone calls' to plan or cover up a crime 'can constitute overt acts in furtherance of a conspiracy.'" *Id.* at *2 (alteration in original)

(quoting *United States v. Naranjo*, 14 F.3d 145,147 (2d Cir. 1994)).  Therefore, the court in *Washington* concluded that "[d]rawing 'every inference' in the government's favor, . . . the jury was justified in concluding by a preponderance of the evidence that Washington knew—or reasonably foresaw—that his calls would be answered in the Southern District of New York. Consequently, [the court saw] no error in the district court upholding Washington's conviction as it relates to venue." *Id.*

### b. Application

The Second Circuit's recent cases confirm the Court's determination that the Government sufficiently established venue in this case by a preponderance of the evidence.

Defendant argues the evidence failed to show that (1) he had any substantial contact with this district; (2) an overt act of the conspiracy was knowingly and intentionally committed by Defendant in this district; or (3) any acts in furtherance of the conspiracy that were committed by co-conspirators were reasonably foreseeable to him.  *See* Dkt. No. 496 at 9.  More specifically, he contends the phone calls he made to credit unions in this district are insufficient to establish venue because they were preparatory acts, and not overt acts that can establish venue for a conspiracy charge.  *See id.* at 13.  In reply to one of the Government's responses, Defendant states that "[t]he government also references a January 11, 2023, message in which Daniyan sent a list of nine credit unions to target, including Saratoga Community Federal Credit Union, however, no conspirators ever visited or attempted to transact at any of those institutions."  Dkt. No. 585 at 9. Defendant explains that "[t]he defense has found no case where idle chit-chatter is an act in furtherance of a conspiracy."  *Id.*

Defendant also argues that the Government edits certain call logs to the 518-area code that is connected to this district.  *See* Dkt. No. 496 at 16.  Defendant makes much of the fact that

representatives from the credit unions that he spoke to did not identify the location of the branch they worked for. *See id.* at 17; *see also* Dkt. No. 585 at 5.

As to acts committed by co-conspirators, Defendant asserts he did not direct anyone to conduct a specific fraudulent transaction in the Northern District of New York, nor did any of the co-conspirators inform Defendant of when they were entering or existing this district. *See* Dkt. No. 469 at 14; Dkt. No. 585 at 9. Defendant notes that any messages that were sent to him referencing "upstate" did not make anything happening in this district reasonably foreseeable because "the word upstate is vague, upstate encompasses the Southern, Western, and Northern District of New York." Dkt. No. 643 at 6. He admits however, that during one phone call, when asked what bank the person used, "the response from the caller was the branch was in in 'Schenectady.'" Dkt. No. 496 at 17. Defendant argues "[t]here is no evidence the defendant knew Loudonville is in the Northern District of New York." Dkt. No. 585 at 5. He avers that "the offense began in the Western District and ended in the Eastern District." Dkt. No. 693 at 12.

As the Government explains in its responses, Defendant is wrong on all accounts. *See* Dkt. Nos. 540, 610, 654.

The Government first notes that Defendant made three phones calls in furtherance of the conspiracy to Sunmark Credit Union which were "routed over the Internet using cloud-based systems to Sunmark employees sitting in this District." Dkt. No. 540 at 10 (citing Gov't Ex. 39).

First, insofar as Defendant labels these phone calls "preparatory," "[a]n overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy. The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d at 320. Courts in the Second Circuit have found venue to be proper based on phone calls which furthered the alleged

conspiracy. *See United States v. Costanzo*, No. 24-CR-1310, 2025 WL 2628399, *9 (2d Cir. Sept. 12, 2025) ("[A] rational jury could find that [one] phone call [between co-conspirators] and [one defendant's] acceptance of benefits from [the other] constituted a continuation of their bribery and honest services fraud offenses, as well as overt acts in furtherance of the related conspiracies"); *United States v. Menendez*, 793 F. Supp. 3d 511, 550 (S.D.N.Y. 2025) ("In support of venue for these counts, the government presented evidence that defendant sent texts and made telephone calls that used cell towers located in this District"); *United States v. Gomez*, 751 Fed. Appx. 63, 69 (2d Cir. 2018) (summary order) ("The call in which [a defendant] requested a vehicle with a secret compartment and [a government informant] agreed to provide such a vehicle, was therefore an overt act in furtherance of the conspiracy").

Indeed, the Second Circuit has expressly stated that "[i]t is beyond question that telephone calls can constitute overt acts in furtherance of a conspiracy." *United States v. Rommy*, 506 F.3d 108, 120 (2d Cir. 2007). The Second Circuit has also rejected the conclusion that the individuals on both ends of the phone call must be co-conspirators. *See United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994); *see also United States v. Kenner*, No. 13-CR-607, 2019 WL 6498699, *5 (E.D.N.Y. Dec. 3, 2019), *aff'd*, No. 21-2289, 2023 WL 4692508 (2d Cir. July 24, 2023).

The jury and the Court listened to each of Defendant's calls to Sunmark and CapCom. The Government also played voice messages from Defendant to co-conspirators that were sent before fraudulent transactions were conducted. The voice messages contained instructions about how to conduct the transactions. The Government also played jail calls made by Defendant when he was awaiting trial. *See* Gov't. Ex. 211. The jury and the Court also heard testimony from the FBI case agent who had interviewed Defendant and, therefore, heard his voice. Conspirators and the FBI agent testified that the voice in the recordings belonged to Defendant or the alias that they

knew him by. *See, e.g.*, Dkt. No. 680 at 69, 118; Dkt. No. 677 at 183. In fact, Defendant asked one co-conspirator if the voice she heard "right now" as in during the cross examination was the same voice she heard in the audio message and she said, "Yes. . . . It's a little bit more clipped but, yeah, it's the same tone." Dkt. No. 677 at 229. Because Defendant chose to represent himself at trial, which he had every right to do, the jury heard his voice for two weeks, it was then able to be compared to the voice on the recordings.

In one of three calls to Sunmark Credit Union, Defendant says that his name is M.M. and he visits the "Schenectady" branch. Gov't. Ex. 39. Schenectady is in the Northern District of New York. The caller asked about bank account limits. It is clear from the Court having heard Defendant's voice for two weeks that he was the caller who referred to a branch in Schenectady. The jury's verdict demonstrates their same belief. Likewise, Defendant called CapCom to ask about a transfer limit. *See* Gov't. Ex. 43. Shane Shoemaker, Broadview Federal Credit Union's Vice President of Financial Crimes, testified during trial that "Broadview was created in 2022, August of 2022 through a merger between two other credit unions formerly known as Cap Com, or Capital Communication Federal Credit Union, and SEFCU, or State Employees Federal Credit Union." Dkt. No. 676 at 19. He stated that in 2022, all CapCom branch locations were in the Northern District of New York. *See id.* He also noted that SEFCU was headquartered in Albany, New York, with majority of the branches being in the Capital District." *Id.*

Providing a bank with the personal identifying information, or "PII," including the name of a fraud victim and his or her bank account number, in order to obtain information about the amount of money in the victim's account and the limit on any transfers is not "preparatory." Defendant's acts in making those calls furthered the conspiracy as those calls permitted the fraud transactions wherein co-conspirators used the information of the people Defendant pretended to

be to execute financial transactions in their names. Those calls were made to credit unions in the Northern District of New York, which establishes venue by a preponderance of the evidence.

Second, the Court rejected Defendant's persistent argument that, because the calls are wired across country, venue could not have been established here as part of its decision on his Rule 29(a) motion. *See* Dkt. No. 684 at 249. The Court explained that "[t]he Second Circuit has expressly stated that venue lies where a wire in furtherance of a scheme begins its course, continued, or ends." *Id.* (quoting *United States v. Rutigliano*, 790 F.3d 398, 397 (2d Cir. 2015)). That statement of law is unchanged, and "[i]n other words, the continuation of a wire transfer is as much an 'act' in continuation of a conspiracy as the beginning or completion of a wire transfer." *United States v. Cohen*, No. 23-CR-134, 2025 WL 3687502, *4 (S.D.N.Y. Dec. 19, 2025); *see also United States v. Hwa*, No. 18-CR-538, 2021 WL 11723583, *20 (E.D.N.Y. Sept. 3, 2021), *aff'd*, 161 F.4th 127 (2d Cir. 2025) ("[V]enue is proper in any district where electronic communications are sent or received. . . . Venue is also appropriate in any district through which electronic communications are routed"). A judge in the Eastern District of New York has noted that "[t]here is no meaningful difference between automatic routings of funds or wire communications and the movement of electronic messaging over Twitter servers. If an electronic wire gives rise to venue in a district by merely passing through, so too do electronic Tweets." *United States v. Mackey*, 652 F. Supp. 3d 309, 328 (E.D.N.Y. 2023). The "principle" that "[v]enue is also proper in any district through which electronic communications in furtherance of the conspiracy pass" "builds on the Second Circuit's longstanding willingness to find venue for a conspiracy properly laid in districts through which conspirators themselves had merely passed." *Id.* at 326-27.

18

In sum, Defendant's argument that his phone calls to credit unions in the Northern District of New York are insufficient to establish venue is without any basis in the law.

Moreover, as the Government argues, "[e]ven if [Defendant's] numerous calls to credit unions in this District were not sufficient for the jury to find venue . . . , there is no question the conduct of [Defendant's] co-conspirators in this District was at least reasonably foreseeable to" him. Dkt. No. 540 at 11. The Government presented dozens of messages that were sent between Defendant and co-conspirators to establish venue. One set of messages between Defendant and Daniyan are illustrative of the evidence presented to the jury that were sufficient for the jury to infer that venue was proper in this district.

The Government displayed messages between individuals named in the messenger application as "Tony" and "Santa." Daniyan testified that "Tony" is him and "Santa" is Defendant. Dkt. No. 682 at 44-45. The messages are contained in Government Exhibit 1b and state, in part, as follows:

- On January 24, 2022, Daniyan and Defendant were discussing what locations to defraud and Defendant stated, "Hudson valley has 20 locations." He stated that he wanted "2 or 3 paper jobs." Defendant then sent Daniyan PII for an individual with initials W.C. which included numerous home addresses in this district and telephone numbers with the 518-area code.

- On January 25, 2022, Daniyan told Defendant that "Cap com went smoothly he was out in 7 minutes." Defendant responded, "Okay good."

- On April 11, 2022, Defendant said "I don't like calling job [sic]" and "I'm trying to see where I can call . . . NY branches or Jersey? NY gives more money than jersey." "I'll call some big unions in NY now . . . Empower and Cap com do it also."

- On April 14, 2022, Defendant asked "Which state we go abuse next with this shared branching[?]" He said, "I'll call more tri state ones when we are ready to move on them." Defendant

19

noted that Hudson Valley branches have "no limit" and "Cap Com says 7500, wow if this is true man we can make quick 500."

- On April 18, 2022, Daniyan told Defendant that "[y]ou can't go in and ask for 7500 without a confirmed oju o."[3] Daniyan stated that "even with confirmed oju I will stick to 5k because managers go dey involved." Defendant responded, "Okay we can do that."

- On April 25, 2022, Daniyan sent a photo of a receipt from a Sunmark Credit Union to Defendant. Daniyan sent a second receipt and then said "Just went in one, system is down going to another Capcom." Then, in discussing a rental car, Daniyan said, "[w]e about to extent till probably Wednesday again just gave him 500 or else they'll call him before 12." Defendant responded, "ok . . . This job sweet." Danyian messaged, again, stating "Capcom system down heading to sunmark." Defendant complained that the cost of the rental car was too much, and Daniyan informed Defendant "[j]ust got another 2500; from S'Mark . . . We heading to Capcom to see if there [sic] system is back up." Daniyan also explained that "[w]e might be coming back home because this mf doesn't have his dope. Capcom system is still down, just called SEFCU they don't share branch. Empower is in Syracuse which is far." Daniyan explained that he "told them to pick me up at 5 am tomorrow." Defendant asked, "[t]o go upstate again right[?]"

- On May 6, 2022, Daniyan told Defendant that one of the other co-conspirators, needed to sober up in a hotel room that Daniyan purchased for her in New Jersey. Daniyan told Defendant, "No doubt I should've had her a** up at a hotel in Albany . . . . Just wasted $80 on her dumbass." Defendant said, "Yea." Then he asked, "[y]ou are taking back upstate tomorrow[?]" Daniyan responded, "Yes."

Gov't. Ex. 1b.

During trial, Daniyan testified that he told Defendant that he could "head there in the morning and round up with papers Upstate." Dkt. No. 682 at 75. Daniyan testified that "Upstate"

---

[3] A language analyst for the Department of Justice testified during trial that the word "oju" could mean different things depending on the context, but one meaning would be "a driver's license" or "identity card." Dkt. No. 677 at 111, 133.

means "Albany and all the rest of the part is considered Upstate when you from the city." *Id.* at
76. He also testified that when he was messaging Defendant about something going wrong at a
Sunmark branch, Daniyan was "up here in the Northern District of New York." *Id.* at 83.

The Second Circuit has affirmed a district court's judgment and a jury's venue
determination on far less evidence than what was presented in his case. For example, in *United
States v. Kirk Tang Yuk*, the Second Circuit noted that although one co-conspirator "did not
directly inform [the leader of the conspiracy] that he was in New York," statements made during a
single phone call were sufficient for the jury to "reasonably infer[]" that the phone call was
transmitted to the co-conspirator who was in New York at the time of the call. *United States v.
Kirk Tang Yuk*, 885 F.3d 57,66-67, 76 (2d Cir. 2018). Despite Defendant's argument that venue
was not reasonably foreseeable to him because co-conspirators did not "inform[]" him "what
district he was conducting the transaction," Dkt. No. 496 at 9, the Court is not aware of any case
law in the Second Circuit which hold that a co-conspirator must tell the defendant the exact city,
county, or state they are in the moment they are committing an overt act in furtherance of the
conspiracy. *See United States v. Menendez*, 759 F. Supp. 3d 460, 510 (S.D.N.Y. 2024)
("[A]lthough the in-district acts must be '"reasonably foreseeable" to a defendant' to make venue
lie in that district, the evidence need not show that a defendant had actual knowledge that
particular acts would occur in a particular district to support venue at that location") (citations
omitted) (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)).

Here, the Government presented sufficient evidence for the jury to find by a
preponderance of the evidence that co-conspirators were engaging in overt acts in furtherance of
the conspiracy in this district. The jury heard testimony that "every branch of Cap Com was
within the Northern District of New York." Dkt. No. 676 at 21-22. Defendant engaged in

conversations with co-conspirators about which credit unions to defraud. Defendant was told

when each fraudulent transaction was complete at a CapCom branch. "[V]enue may be proved by

circumstantial evidence." *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984) (citing

*United States v. Gargiso*, 456 F.2d 584, 588 n.5 (2d Cir. 1972). Defendant asked a co-conspirator

if he would be returning "Upstate" after the co-conspirator stated he should have already been in

"Albany." Gov't. Ex. 1b. Defendant is correct that people from all over the State of New York

have different definitions of "Upstate." Dkt. No. 643 at 6. However, the Government's proof was

considered by twelve jurors from counties across this district—as south as Ulster County and as

North as Hamilton County.[4] Those jurors heard the Government's proof as well as Defendant's

persistent argument that venue was improper in this district. Defendant raised the issue in his

opening and closing statements to the jury as well as his cross examination of witnesses. The jury

did not credit Defendant's arguments and instead found that venue was sufficiently established in

this district for each of the crimes charged. This Court entirely agrees with that finding and

denies Defendant's motions insofar as they challenge venue.[5]

---

[4] *See* United States District Court Northern District of New York Criminal Case Filing Divisions, https://www.nynd.uscourts.gov/sites/nynd/files/criminalfilingmap.pdf (last visited Feb. 23, 2026) (differentiating the "Albany Division" from which jurors are pooled for trials in Albany).

[5] Defendant argues that the Government altered the phone number of a CapCom branch in its exhibits to show that Defendant called a "518" number instead of an "800" number in order to improperly persuade the jury regarding venue. See Dkt. No. 496 at 9. Government Exhibit 144(e) notes a call from one of Defendant's phone numbers to Broadview Federal Credit Union on 12/09/2021 which was too an 800 number. Broadview, at that time, was actually SEFCU. Government counsel noted in its direct examination of Shoemaker that it would be referring to CapCom and SEFCU as Broadview even for transactions that occurred before the merger. See Dkt. No. 676 at 22. Assuming, *arguendo*, that the Government mixed up phone numbers on an exhibit and used a 518 phone number instead of an 800 number, this would not have altered the jury's outcome and does not alter the Court's decision. Defendant called credit unions in this district and knew that his co-conspirators were entering this district to conduct fraudulent transactions from which he profited. Venue was, therefore, established by a preponderance of the evidence.

### 4. Sufficiency of the Evidence

"A jury's verdict must be upheld 'if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Hild*, 147 F.4th 103, 109 (2d Cir. 2025) (quoting *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021)). "In a conspiracy case, the deference accorded a jury's verdict is 'especially important' because 'a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* at 109-10 (quoting *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021)).

In its jury instructions, the Court explained each of the elements the Government was required to prove related to each count of the indictment. *See* Dkt. No. 667. As to the alleged conspiracies, the Court explained that the Government was required to prove "[f]irst, two or more persons entered the unlawful agreement charged in Count One of the Second Superseding Indictment from on or about November 2021 through on or about December 12, 2023; and [s]econd, that the Defendant knowingly and willfully became a member of the conspiracy." *Id.* at 23. As to count one, the Court explained as follows:

> The elements of bank fraud are as follows:
>
> First, that there was a scheme to defraud a financial institution or a scheme to obtain money owned by or under the custody or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> Second, that the Defendant executed or attempted to execute the scheme with the intent either to defraud the financial institution or to obtain money or funds owned by or under the custody or control of the financial institution; and

Third, that the entity involved was a financial institution.

*Id.* at 30-31.  The Court then explained each of the elements in detail.  *See id.* at 31-35.

As to count two, the Court explained each of "[t]he elements of promotional money laundering"; "[t]he elements of concealment money laundering"; and "[t]he elements of transactions in criminally derived property."  *Id.* at 39-26.  Finally, the Court explained that, for counts three through eleven,

> In order to find the Defendant guilty of aggravated identity theft, the Government must prove the following elements beyond a reasonable doubt:
>
> First, the Defendant knowingly used a means of identification of another person;
>
> Second, the Defendant used the means of identification during and in relation to the offense of conspiracy to commit bank fraud charged in Count One; and
>
> Third, the Defendant acted without lawful authority.

*Id.* at 49.

Defendant does not take issue with any of the Court's instructions as to the elements and necessary proof related to any of the counts of the indictment.  Rather, Defendant argues that "[t]he Government's evidence at trial provide multiple distinct conspiracies, not a single one," Dkt. No. 496 at 5; that Government "failed to show [D]efendant knowingly joined and participated in the conspiracy," *id.* at 7; the Government did not establish that the transaction of extending a vehicle rental was for the purpose of promoting unlawful activity, *see id.* at 25; there was no evidence that proceeds from transactions conducted in this district "was sent via Zelle, CashApp or hand delivered to the defendant and then concealed," *id.*; that any single transactions

exceeded $10,000, *see id.* at 27-28; or that he aided and abetted co-conspirators in committing aggravated identity theft, *see id.* at 29-31.

The Government opposes each of Defendant's assertions, reiterating some of the evidence it presented to the jury in support of each count of conviction. *See* Dkt. No. 540 at 9-18.

For the following reasons, the Court concludes that the Government presented sufficient evidence on every count of the indictment such that "*any* rational trier of fact could have found the essential elements of [each] crime beyond a reasonable doubt." *United States v. Wynder*, 147 F.4th 200, 212 (2d Cir. 2025) (quoting *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009)).

Defendant's submissions to the Court are rife with admissions of his guilt as to each and every count for which he was charged and found guilty. All of Defendant's arguments tend to relate to only two of Defendant's theories for why he could not have been convicted in this district of the charged crimes: improper venue and multiple distinct conspiracies. The Court's efforts in ruling on Defendant's repetitious and, occasionally, untimely filings are, in some ways, an exercise in futility. To demonstrate the arguable waste of judicial resources being spent on addressing Defendant's arguments regarding the sufficiency of the evidence at trial, the Court will quote only a smattering of Defendant's own statements in which he admits his guilt. He writes in his motions, as follows:

> "Defendant recruited Heather Gaedt in July 2023 after the working relationship with Daniyan ceased on May 30, 2023." Dkt. No. 496 at 6.

> "The evidence at trial showed [D]efendant transferred PII to Daniyan[.]" *Id.* at 7.

"The agreement between SANTA and Daniyan in the Northern District of New York was solely shared branching fraud not 'financial institutions as the indictment alleges." *Id.* at 8.

"The manner of means the defendant agreed to with Daniyan was withdrawing funds from financial institutions through shared branching." *Id.*; *see also* Dkt. No. 532 at 21-23.
"There were numerous conversations between the defendant and Daniyan about CapCom withdrawal limits between April 11 and May 3, 2022." Dkt. No. 643 at 5.

"SANTA transferred the complete PII of S.A." Dkt. No. 496 at 29.

In his closing statements to the jury, Defendant stated that "What the proof actually shows, it shows individuals who were connected to Mr. Adekoya. We have a chart here. Mr. Adekoya is called the plug." Dkt. No. 563 at 89. "When you look at [the Government's] chart, Mr. Adekoya is the only—the individual that worked with each one of these guys independently from each other." *Id.* at 90. He explained that "[t]he role of Santa was to obtain the PII and transfer PII to Mr. Daniyan." *Id.* at 95. Defendant described his messages with Daniyan as "we both brainstorming at the time to determine how we are going to do the job and get the job done." *Id.* at 98. Defendant confirmed, "Santa picks up the phone and calls Sunmark Credit Union." *Id.* at 105. Referring to himself in the third person, Defendant stated that "Mr. Adekoya did what he did with separate individuals to maximize how much money was coming back to him." *Id.* at 118. He also confirmed that "[t]hese phone calls, after they were placed, the defendant was successful, able to transfer money between individuals' accounts that he had in the transfer, the transactions that occurred were those accounts occurred elsewhere." *Id.* at 121.

With Defendant's own statements, the Court's previous analysis regarding venue, and the Court's forthcoming analysis on the issue of a single conspiracy, the Court has more than enough to conclude that "*any* rational trier of fact could have found the essential elements of the crime

26

beyond a reasonable doubt." *United States v. Wynder*, 147 F.4th 200, 212 (2d Cir. 2025) (quoting

*United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009).  Nevertheless, because he is

proceeding *pro se*, the Court affords him special solicitude and addresses each of his arguments,

attacking the sufficiency of the evidence, in turn.

### a.  Multiple Conspiracies versus a Single Conspiracy

Defendant argued repeatedly during trial and in his post-trial motions that the Government

failed to prove a single conspiracy but instead proved the existence of multiple distinct

conspiracies which could not be charged together.  Defendant does not dispute his involvement in

the conspiracy, that he was "the hub of this conspiracy."  Dkt. No. 563 at 91.  He argues only that

the other individuals in the conspiracy did not know each other.  *See id.*; *see also* Dkt. No. 496 at

4-6.

The Government disagrees, arguing that "[e]ach co-conspirator who testified explained to

the jury their awareness of other co-conspirators beyond those with whom they had direct

interactions."  Dkt. No. 540 at 8.

The Court addressed this issue in its jury instructions.  Specifically, the Court informed

the jury as follows:

> In this case, Defendant argues that the Government's proof fails to
> show the existence of one overall conspiracy.  Rather, Defendant
> contends the Government's proof shows several separate and
> independent conspiracies with various groups of members.
>
> Whether there existed a single unlawful agreement, or many such
> agreements, or indeed, no agreement at all, is a question of fact for
> you, the jury, to determine in accordance with the instructions I am
> about to give you.

Dkt. No. 667 at 25. The Court then instructed the jury on the differences between a single conspiracy and "several separate and independent conspiracies." *Id.* Defendant does not challenge the Court's instruction on this issue.

"[A] single conspiracy may be found where there is mutual dependence and assistance among the [participants], a common aim or purpose . . . or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Tuzman*, 301 F. Supp. 3d 430, 447 (S.D.N.Y. 2017) (second and third alterations in original) (quoting *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989)). "All that needs to be proved is that it reasonably could be inferred that [the defendants] participated in the alleged enterprise with a consciousness of its general nature and extent." *Id.* (quotation omitted). "The members of the conspiracy do not have to conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member." *Id.* (quotation omitted). "There is no requirement that the same people be involved throughout the duration of the conspiracy." *Id.* (quotation omitted); *see also United States v. Chartier*, No. 22-3125, 2024 WL 3617023, *5 (2d Cir. Aug. 1, 2024) ("A single conspiracy may encompass members who neither know one another's identities nor specifically know of one another's involvement") (quoting *United States v. Sureff*, 15 F.3d 225, 230 (2d Cir. 1994)).

The Government presented, and the jury heard, testimony from Co-defendant Crystal Kurshner in which she stated she was recruited by Co-defendant Kanie Bassie. *See* Dkt. No. 677 at 170, 225. Co-defendant Lesley Lucchese testified she was recruited by Co-defendant David Daniyan. *See* Dkt. No. 678 at 55. Co-defendant Jerjuan Joyner was also recruited by Daniyan. *See* Dkt. No. 679 at 19. Joyner testified that he knew Daniyan was working with someone else.

28

*See id.* at 76.  Co-defendant Victor Barriera testified that he was recruited by Joyner.  *See id.* at 151.  Barriera also knew Daniyan.  *See id.* at 155.  Co-conspirator 15[6] was recruited by co-conspirator 14.  *See* Dkt. No. 680 at 86.  Co-conspirator 15 knew that co-conspirator 14 was working for someone by the name of "Legendary."  *Id.* at 89.  Co-defendant Davon Hunter testified that he was recruited by Bassie.  *See* Dkt. No. 681 at 130-31.  Hunter testified that Defendant gave Bassie PII.  *See id.* at 132-33.  Co-defendant Danielle Cappetti testified that she was recruited by Daniyan.  *See id.* at 44-45.

Defendant agrees with this and sets forth these connections in his motion for acquittal.  *See* Dkt. No. 496 at 6.  He also acknowledges that "[t]he Government-elicited testimony from numerous members of the conspiracy that they knew of other groups doing the same exact things they were doing, several defendant[]s testified they knew the conspiracy involved other participants . . . ."  *Id.*  He argues, however, that "they had no knowledge who the other individuals where and whom they worked for or worked with.  No sub-group activity had an overlap as each sub-group worked independently with the hub."  *Id.*

As stated, "[a] single conspiracy may encompass members who neither know one another's identities nor specifically know of one another's involvement."  *Chartier*, 2024 WL 3617023, at *5 (citation and quotation marks omitted).  Daniyan testified that he knew Defendant was working with other people.  *See* Dkt. No. 682 at 12-17.  He testified to conversations he had with Defendant about helping other spokes of the conspiracy.  *See id.* at 165-66.  The Government also played phone calls between Defendant while he was incarcerated with Bassie in which they discussed other members of the conspiracy.  *See* Dkt. No. 679 at 220-23.

---

[6] This individual was not indicted for these crimes.  The Government provided the Court with a key concerning individuals' names and their initials or co-conspirator number which is sealed at Dkt. No. 473.

Defendant's own admissions foreclose his arguments. He admits, in his own words, that co-conspirators "knew of other groups doing the same exact things they were doing." Dkt. No. 496 at 6. The jury chose to credit that testimony as well as Defendant's own statements that were made during the jail calls, which the Court agrees is sufficient to establish "'a common aim or purpose or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture.'" *Chartier*, 2024 WL 3617023, at *5 (quoting *Vanwort*, 887 F.2d at 383).

As such, the Court finds that the Government sufficiently proved a single bank fraud and money laundering conspiracy. Defendant's motions on this ground are denied.

### b. Knowledge and Intent to Join Conspiracy

"To sustain a conviction for conspiracy, the government must prove that the defendant 'knowingly joined and participated in [the conspiracy]' and 'possessed the specific intent to commit the offense that was the object of the conspiracy.'" *United States v. Babilonia*, 854 F.3d 163, 175 (2d Cir. 2017) (quoting *United States v. Valle*, 807 F.3d 508, 515-16 (2d Cir. 2015)).

"'[D]irect proof of defendant's fraudulent intent is not necessary'; rather, '[i]ntent may be proven through circumstantial evidence.'" *Hild*, 147 F.4th at 112 (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). "Circumstantial evidence probative of a conspiracy may include, for example, a defendant's association with conspirators 'in furtherance of the conspiracy,' . . . his presence at 'critical stages of the conspiracy that cannot be explained by happenstance,' . . . or his possession of items that are of essential significance to the conspiracy[.]" *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (quoting *United States v. Aleskerova*, 300 F.3d 286, 292-93 (2d Cir. 2002)).

Defendants argues that he did not tell Daniyan or anyone else in the conspiracy exactly where to go, when, who to use as a worker, or how much money to withdraw, *see, e.g.*, Dkt. No. 496 at 7-9, and that "[t]he agreement between SANTA and Daniyan in the Northern District of New York was solely shared branching fraud not 'financial institutions as the indictment alleges," *id.* at 8. Defendant argues that the "[t]he manner of means the defendant agreed to with Daniyan was withdrawing funds from financial institutions through shared branching," which resulted in the trial evidence constructively amended the indictment. *Id.*

First, "'[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Chartier*, 2024 WL 3617023, at *6 (quoting *United States v. Dove*, 884 F.3d 138, 149 (2d Cir. 2018)) (additional citation omitted). The Second Circuit will reverse a conviction on this issue "only . . . if the defendant shows both: (1) the existence of a variance, and (2) that 'substantial prejudice' occurred at trial as a result." *Id.* (citation and additional quotation marks omitted).

No variance or constructive amendment occurred in this case. As the Government explains, "credit unions are financial institutions under the relevant statute[.]" Dkt. No. 540 at 9 (citing 18 U.S.C. § 20(2)). Likewise, "'[t]o prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.'" *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (quoting United States v. Frank, 156 F.3d 332, 337 (2d Cir. 1998)) (additional citation omitted). "'Where charges are constructively narrowed or where a generally framed indictment encompasses the specific legal theory or evidence used at

31

trial,' there is no constructive amendment." *Id.* (quoting *United States v. Wallace*, 59 F.3d 333, 337 (2d Cir. 1995)); *see also* Dkt. No. 540 at 9.

Defendant has not presented any case law establishing that it is error for an indictment to refer generally to a "financial institution" but the proof of trial to relate to one of the specific financial institutions defined by statute. In essence, the indictment alleges that Defendant conspired with others to defraud financial institutions by using false pretenses to obtain money. *See* Dkt. No. 299 at ¶ 1. That was proven at trial. Defendant's argument that the evidence altered the indictment is meritless.

Second, Defendant's knowledge and intent was not only established through circumstantial evidence, but direct evidence of Defendant's own messages and phone calls. The Government presented dozens of messages from Defendant wherein he was discussing which banks to defraud, how much money he could make, who was working for him, and how many transactions had been completed. *See* Gov't. Ex. 1b. The Government also played for the jury voice recordings wherein Defendant explained to co-conspirators how to conduct the fraudulent transactions. *See, e.g.*, Dkt. No. 681 at 180-85 (testifying about the voice recordings). Finally, the jury heard Defendant's statements made during phone calls from the jail to co-conspirators about this case and the people involved. He stated while incarcerated awaiting trial things, such as "they got all this sh** from your boy. . . . He fu**ed up . . . . They went in his phone. But I had a time limit on the joint, but this n**** took the timer off. He's got messages all the way from July to October." Gov't. Ex. 211c. Defendant used another incarcerated individual's pin number to call from to hide his calls so the other person "don't gotta worry about it." Gov't. Ex. 211d. Defendant said he had been doing that for eleven months. *See id.* Defendant told the person he called not to "cop out" because everyone who already "copped out" "did something up here." Gov't. Ex. 211e. When

saying that a co-conspirator had overdosed on drugs, Defendant said it was "a good thing" because she "told" and did a video interview.  Gov't. Ex. 211f.  Defendant said he "hope[s] she burns in hell."  *Id.*  Defendant, despite all his efforts to conceal his involvement, repeatedly admitted to his knowledge and intent.

Defendant's statements, combined with other evidence such as his unexplained wealth, the pictures of bank receipts being sent to him, etc. constitute legally sufficient evidence for the jury to have found him guilty on counts one through eleven of the indictment.  His motions on this issue are denied.

### c. Proof of Status of Financial Institutions as Federally Insured

Defendant argues the Government failed to prove that various financial institutions were federally insured, which "is fatal to the conspiracy to commit bank fraud charge."  Dkt. No. 496 at 20.  The Government contends it "was only required to show that one financial institution targeted by the conspiracy was federally insured," which it did through the testimony of credit union employees.  Dkt. No. 540 at 9.  Defendant argues in his reply that the testimony is insufficient. *See* Dkt. No. 643 at 3.

The Court addressed this issue in its jury instructions.  The Court stated as follows:

> The third element of the crime of bank fraud is that the entity in question was a financial institution, as defined by statute, at the time of the scheme.  This simply means that the financial institution was either a bank insured by the Federal Deposit Insurance Corporation (FDIC), or a credit union with accounts insured by the National Credit Union Share Insurance Fund (NCUSIF) during the time frame alleged in the Second Superseding Indictment.
>
> The Government need not show that the Defendant knew that a financial institution was federally insured to satisfy this third element.  The Government also is not required to prove that every credit union and bank targeted by the conspiracy was a "financial institution."  However, if you determine that no bank or credit union

targeted by the conspiracy was a "financial institution," you must
return a verdict of not guilty.

Dkt. No. 667 at 34-35.

Defendant argues, not only, that there was insufficient proof that the financial institutions
were federally insured, but that the Court's instruction was incorrect because it did not "instruct
the jury that the government was not required to prove that every financial institution targeted by
the conspiracy was federally insured." Dkt. No. 352 at 11.

"To show an erroneous jury instruction affected his substantial rights, the defendant must
show 'a reasonable probability that the jury would not have convicted him absent the error.'"
*United States v. Hild*, 147 F.4th 103, 115 (2d Cir. 2025) (citation omitted). "As a general matter,
no particular wording is required for a jury instruction to be legally sufficient, but rather, this
Court must 'look to the charge as a whole to determine whether it adequately reflected the law and
would have conveyed to a reasonable juror the relevant law.'" *United States v. Gabinskaya*, 829
F.3d 127, 132–33 (2d Cir. 2016) (quoting *United States v. Mulder*, 273 F.3d 91, 105 (2d Cir.
2001)).

In stating his objections to the jury instructions, Defendant argued that where the Court
stated, "the entity involved [must] be a financial institution," Dkt. No. 667 at 31, the Court should
also "instruct the jury that it must be a *federally insured* financial institution under 18 U.S.C. 21
and 2." Dkt. No. 684 at 266 (emphasis added). The Court noted that it did include the additional
instruction defining a financial institution as being federally insured and Defendant responded,
"Okay, your honor." *Id.* 267.

"The well established elements of the crime of bank fraud are that the defendant (1)
engaged in a course of conduct designed to deceive *a* federally chartered or insured financial

institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss." *Hagigi v. Yukhananov*, No. 23-CV-5549, 2024 WL 4028333, *7 (E.D.N.Y. Sept. 3, 2024) (emphasis added) (quoting *United States v. Norris*, 513 Fed. Appx. 57, 59 (2d Cir. 2013)); *see also United States v. Barrett*, 178 F.3d 643, 647-48 (2d Cir. 1999); *United States v. Johnson*, 553 Fed. Appx. 78, 79 (2d Cir. 2014).

   Defendant has not presented any case law which holds that the Government must establish that every single financial institution must be federally insured.  Nor has Defendant presented a valid argument that the Court improperly instructed the jury or that the jury convicted him of bank fraud unrelated to a federally insured financial institution.  The Court instructed, in part, that the institution(s) as issue had to be "a credit union with accounts insured by the National Credit Union Share Insurance Fund (NCUSIF)."  Dkt. No. 667 at 34-35.  The jury heard testimony that Broadview, CapCom, and SEFCU were all insured by the NCUSIF.  *See* Dkt. No. 676 at 21.  The jury also heard testimony that Truliant Federal Credit Union, First Heritage Credit Union, and UFirst Federal Credit Union were NCUSIF insured.  *See id.* at 148-55.  The same is true for Grow Financial Federal Credit Union.  *See* Dkt. No. 677 at 146.

   Insofar as Defendant challenges this testimony, alone, as insufficient, the Government correctly states that "many of the victim account statements introduced into evidence bear insignia showing that the issuing credit union was federally insured."  Dkt. No. 540 at 15 (citing Gov't. Exs. 37, 39, 67a).

   This evidence was sufficient for the jury to conclude that Defendant's conduct defrauded "financial institutions" insofar as they were either a bank insured by the Federal Deposit Insurance Corporation , or a credit union with accounts insured by the National Credit Union Share Insurance Fund.  This aspect of Defendant's motions is denied.

### d. Evidence of Money Laundering

Defendant argues there was insufficient evidence of promotional or concealment money laundering to convict him of count two for conspiracy to commit money laundering. *See* Dkt. No. 496 at 25-28. Specifically, Defendant contends (1) the evidence failed to show that rental car was extended in furtherance of the conspiracy; (2) that any proceeds generated from fraudulent transactions occurring in this district were sent to him and then concealed, and (3) that a single transaction resulted in proceeds over $10,000. *See id.*

The Government contends Defendant's arguments miss the mark; that the evidence showed not only the extension of a one-time car rental in furtherance of the conspiracy, but that there was an open agreement regarding rental cars and the fraud proceeds were also "were used to pay for fake driver's licenses through multiple payments to Co-Conspirator 19, in addition to travel for co-conspirators throughout the conspiracy." Dkt. No. 540 at 16. The Government also notes that testimony and bank account records showed that fraud proceeds were given directly to Defendant after some transactions were conducted, Defendant had no legitimate source for the money he and his wife obtained, and thousands of dollars each month were deposited into his wife's bank account. *See id.* at 17. As to a singular transaction over $10,000, the Government cites to Shane Shoemaker's testimony wherein he explained "that the purchase of a cashier's check is in fact several separate transactions." *Id.* at 18.

In its jury instructions, the Court explained that promotional money laundering occurs "by knowing that the property involved in one or more financial transactions represented the proceeds of some form of unlawful activity, [and] conducting and attempting to conduct such a financial

transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity, . . . with the intent to promote the carrying on of" the bank fraud.  Dkt. No. 667 at 35-36.  As to concealment money laundering, the Court stated that it occurs "by knowing that the property involved in one or more financial transactions represented the proceeds of some form of unlawful activity, [and] conducting and attempting to conduct such a financial transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity, . . . in whole and in part to conceal and disguise the" fraud.  *Id.* at 36.

Finally, as to transactions in criminal derived property, the Court explained that it occurs "by knowingly engaging and attempting to engage in one or more monetary transactions by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000 that was derived from . . . bank fraud."  *Id.* at 36-37.

The Government is correct that it presented sufficient evidence at trial for the jury to conclude beyond a reasonable doubt that bank fraud proceeds were used to purchase and extend rental cars which were used to conduct additional fraudulent transactions; Defendant concealed bank fraud funds across bank accounts, including his wife's bank account; and there are hundreds of messages between Defendant and Daniyan wherein they discuss rental cars, rental car extensions, and purchasing fake driver's licenses.  *See* Gov't. Ex. 1b.  The Government argued, and the jury believed, that those purchases were made to promote the bank fraud.  Defendant has presented no argument to counteract that conclusion.  Likewise, the Government presented evidence that bank fraud proceeds were placed into his wife's bank account and neither held legitimate employment that would produce the consistently deposited funds.  *See* Gov't. Ex. 281.  The jury chose to credit that evidence, and the Court finds no grounds on which to second guess that conclusion.  Finally, Mr. Shoemaker did testify that purchasing a cashier's check generally

constitutes more than one financial transaction.  *See* Dkt. No. 676 at 30-34.  The jury heard

testimony from co-conspirators that they took out $10,000 from a bank account and took out

cashier's checks for $40,000 or $45,000.  *See* Dkt. No. 677 at 89, 188.  This testimony and the

corresponding photos and documents related to the fraudulent transactions were credited by the

jury as sufficient to establish engaging in a monetary transaction with criminally derived funds

from bank fraud over $10,000.  Again, Defendant has presented no meritorious grounds on which

to vacate that jury's judgment.  As such, Defendant's motion on this issue are denied.

### e. Evidence of Aiding and Abetting Aggravated Identity Theft

Defendant argues that he could not have been convicted of aiding and abetting aggravated

identity theft because he did not personally transfer the PII used by the co-conspirator who

entered the bank(s) and conducted the fraudulent transactions.  *See* Dkt. No. 496 at 29-31.

Defendant's argument is entirely baseless.  Defendant has not presented any legal authority

that stands for the proposition that he could only be convicted on the aggravated identity theft

counts if he handed PII directly to the person who then used that information to engage in a

fraudulent transaction.  Rather, as the Government states, the evidence showed that Defendant

called financial institutions to obtain information, he collected "publicly available HELOC

information on each identity theft victim listed in Counts 3 through 11 (and every bank fraud

transaction proven at trial) through CoreLogic prior to the date when a co-conspirator

impersonated the subject victim," and he sent PII to Daniyan through a messaging application.

Dkt. No. 540 at 18.  Defendant's conduct aided and abetted Defendant's co-conspirators to take

the information Defendant provided and create fake identifications, walk into financial

institutions, and steal other people's money.  The Court sees no grounds on which to overturn the

jury's verdict on counts three through eleven.

38

In sum, the Court rejects Defendant's arguments attacking the sufficiency of the evidence the jury relied on to convict Defendant of all eleven counts from the indictment. Defendant's motions are denied insofar as they challenge the sufficiency of the evidence used to convict him.[7]

### 6. Evidentiary Rulings

Defendant argues that the Court erred in numerous evidentiary rulings. "[T]o the extent that the defendant objects now to evidentiary rulings made by the Court prior to and during trial . . . those arguments are improper on a Rule 33 motion absent 'manifest injustice.'" *United States v. Aiyer*, 470 F. Supp. 3d 383, 410 (S.D.N.Y. 2020), *aff'd*, 33 F.4th 97 (2d Cir. 2022); citing *United States v. Soto*, No. 12-CR-566, 2014 WL 1694880, at 7 (S.D.N.Y. Apr. 28, 2014), *aff'd sub nom.*, *United States v. Ramos*, 622 Fed. Appx. 29 (2d Cir. 2015); *see also United States v. Bendelstein*, No. 18-CR-00309, 2023 WL 2457842, *8 (E.D.N.Y. Mar. 10, 2023).

### a. Unexplained Wealth

Defendant first argues the Court erred in permitted the Government to introduce evidence of his unexplained wealth because "the [G]overnment exploited the wealth evidence to appeal to the jury's sense of unfairness or suspicion of the Defendant's lifestyle." Dkt. No. 532 at 14. The

---

[7] In his motion for bail pending his appeal, Defendant argues that the Government elicited false testimony about a single fraudulent transaction at Hudson River Community Credit Union. *See* Dkt. No. 718 at 22-26. "The Second Circuit has explained that in considering motions for a new trial based on the allegation that perjured testimony was admitted at trial, '[p]erjury in and of itself is insufficient to justify relief under Rule 33.'" *United States v. Dore*, No. 12-CR-45, 2013 WL 3965281, *4 (S.D.N.Y. July 31, 2013) (quoting *United States v. Stewart*, 433 F .3d 273, 297 (2d Cir. 2006)). "Instead, 'when a trial has been tainted by false testimony,' the Court must determine 'whether false testimony was prejudicial in the sense that it affected the outcome of the trial,' which is done by assessing 'the materiality of the perjury to the verdict.'" *Id.* (citation omitted). Even assuming, *arguendo*, that the Government did elicit false testimony, none of the counts of conviction concerned a fraudulent transaction at Hudson River Community Credit Union; therefore, any error did not affect the outcome of the trial.

Court ruled on this issue before trial.  *See* Dkt. No. 429 at 18-19.  Defendant has not presented

any argument establishing that the Court's ruling resulted in manifest injustice.

"Evidence is relevant if 'it has any tendency to make a fact more or less probable than it

would be without the evidence" where "the fact is of consequence in determining the action.'"

*United States v. McPartland*, 81 F.4th 101, 114 (2d Cir. 2023) (quoting FED. R. EVID. 401).  "A

district court 'may exclude relevant evidence if its probative value is substantially outweighed by

a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'"  *Id.* (quoting

FED. R. EVID. 403).

As explained in the pre-trial ruling, "'[e]vidence of unexplained wealth may [] be

introduced if it is probative of a defendant's illegal dealings.'"  Dkt. No. 429 at 19 (quoting *United*

*States v. Delvecchio*, 816 F.2d 859, 863-64 (2d Cir. 1987)) (additional citations omitted).  The

Government presented testimony regarding Defendant and his wife's income tax returns from

2021 through 2024.  *See* Dkt. No. 83-104.  The evidence presented to the jury demonstrated that

although Defendant's wife did work at a retail store for a period of time, there was no reported

wages or employment which accounted for the annual income they both reported.  *See id.*

Likewise, the Government presented evidence that Defendant spent approximately $18,000 on a

baby shower, *see* Dkt. No. 676 at 11; and he ordered a $211,000 G-wagon, *see* Dkt. No. 681 at

14-15.  However, the wage inquires for Defendant for New York and New Jersey between 2021

and 2024 revealed no employment.  *See* Dkt. No. 684 at 83.  Defendant does not challenge these

factual assertions in his motion.

Based on this evidence, the Court finds no error in its previous ruling to permit evidence

of Defendant's unexplained wealth as probative of his participation in the alleged conspiracies.

### b. *Prior Conviction*

Defendant argues that his prior conviction from New Hampshire was improperly admitted into evidence as violative of Rule 404(b) of the Federal Rules of Evidence.  *See* Dkt. No. 532 at 23-25.  This issue was also decided pre-trial.  Specifically, the Court explained that Defendant had a prior federal conviction for bank fraud and conspiracy to commit bank fraud and concluded that the Government could introduce evidence of the same largely because of the similarly in the past and present crimes.  *See* Dkt. No. 429 at 11-18.

"Rule 404(b) governs the admissibility of evidence of 'other acts'—'crimes, wrongs, or acts' other than those charged in the indictment." *United States v. McPartland*, 81 F.4th 101, 114 (2d Cir. 2023) (quoting Fed. R. Evid. 404(b)) (footnote omitted).  "Such evidence is not admissible 'to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character,' but it may be admitted 'for another purpose.'" *Id.* at 114-15 (quoting Fed. R. Evid. 404(b)(1), (2)).  This Court explained in its pre-trial ruling that the Second Circuit permits "other act" evidence where a defendant fails to "'remove[] the element of intent or knowledge from a case[.]'" Dkt. No. 429 at 13 (quoting *United States v. Nachamie*, 101 F. Supp. 2d 134, 138 (S.D.N.Y. 2000)).  To this day, Defendant argues he lacked the requisite knowledge and intent to support the convictions.  As such, it was not a manifest injustice to permit the Government to introduce evidence that less than ten years before the underlying crimes were committed, Defendant had been convicted by a jury of obtaining bank account information for other people and using it to steal their money.  *See* Dkt. No. 687 at ¶ 52 (explaining the prior conviction).[8]

---

[8] The Court also provided a limiting instruction to the jury, explaining that Defendant was not on trial for any prior acts.  *See* Dkt. No. 667 at 14-15.

### c. Jail Calls

Defendant argues the Court erred in permitting the Government to play the recorded jail calls to the jury, especially the call containing a statement directed at a deceased co-conspirator. *See* Dkt. No. 532 at 14; Dkt. No. 643 at 16. Defendant argues it caused undue prejudice, and any limiting instructions were not curative. *See id.*

The Court also addressed this issue in ruling on the parties' motions *in limine*. *See* Dkt. No. 429 at 4. The Court permitted the evidence as relevant, non-hearsay evidence for which the prejudicial value did not outweigh the probative effect. *See id.* at 4-8. The Court also delivered limiting instructions to the jury throughout trial and in its final jury instructions, explaining that Defendant's incarceration could not be used as evidence of his guilt. *See* Dkt. No. 667 at 15; *see also* Dkt. No. 679 at 219.

Defendant's arguments are incredulous. The statements made during the jail calls demonstrated his knowledge, intent, and involvement in the alleged crimes. They easily meet the definition of relevance. As to the statements Defendant made about a specific co-conspirator, the Court acknowledged in its pre-trial ruling their prejudicial effect. *See* Dkt. No. 429 at 7-8. However, the Court then, and now, concludes that the probative value was not substantially outweighed by the prejudicial effect. *See id.* Defendant persists that he had no knowledge or intent related to the conspiracy and that the co-conspirators did not know each other. However, he spoke to another co-conspirator on the phone and explained that he was happy one co-conspirator was dead because she had "told" and been interviewed about the crimes. It was not a manifest injustice to permit introduction of Defendant's own words to prove his guilt.

### d. Summary Charts, Evidence, and Testimony

Defendant argues the Court erred in permitting certain testimony and exhibits because they were "repeated presentations of the same speculative themes" because such evidence was prejudicial. Dkt. No. 532 at 16-17. The Court disagrees.

Federal Rule of Evidence 403 permits the exclusion of relevant evidence if "its probative value is substantially outweighed by a danger of "wasting time[] or needlessly presenting cumulative evidence." FED. R. EVID. 403. The Government was tasked with proving beyond a reasonable doubt that Defendant engaged in a years-long conspiracy across multiple states, numerous financial institutions, and involving over a dozen co-conspirators who worked with Defendant to steal millions of dollars. The Court finds that the Government provided such proof to the jury in a permissible manner. Indeed, when the Court thought the evidence might have begun to tip in favor of being cumulative, the Court instructed the Government to be mindful of such an issue. *See, e.g.*, Dkt. No. 680 at 243; Dkt. No. 681 at 10-11; Dkt. No. 682 at 225.

The Court finds no error in its rulings on this issue and denies Defendant's motion.

### e. Out-of-Court Statements

Defendant argues the Court improperly admitted out of court statement from a "distinct conspiracy." Dkt. No. 532 at 25. Specifically, Defendant argues that "[t]he [G]overnment introduced out-of-court statements made by Hunter, Bassie and Brooks to establish acts in the Northern District of New York. However, the record shows that these individuals were engaged in a distinct conspiracy in a different time frame from the conduct in the Northern District of New York, separate from any alleged agreement involving the Defendant." *Id.* This argument is, in essence, another way of arguing the issue of venue. Insofar as Defendant is challenging venue, that issue has been thoroughly ruled upon.

Defendant did not present specific statements he contends were improperly admitted. Therefore, the Court is unable to conduct any meaningful analysis as to the admission of any statements. However, the Court will note that "[u]nder Rule 801(d), an out-of-court statement offered for the truth of its contents is not hearsay if '[t]he statement is offered against an opposing party and' it 'was made by the party's coconspirator during and in furtherance of the conspiracy.'" *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (quoting FED. R. EVID. 801(d)(2)(E)). "'[I]n order to admit a statement under this Rule, the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'" *Id.* (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990)).

At the beginning of the trial, the Court permitted evidence over Defendant's objection but noted that "at some point in time, in terms of any of these individuals who are being proffered as co-conspirators, [the Court was] going to look at the evidence in the whole and decide whether or not these are statements of co-conspirators made in furtherance of the conspiracy." Dkt. No. 677 at 86. The Court noted that it was "listening to [many statements] in real time as [Defendant was], and before the Government concludes, if I think that any of the statements were not made in furtherance of the conspiracy, I will strike them . . . as hearsay." Dkt. No. 680 at 37. Defendant responded, "Okay." *Id.* A few days later, the Court "state[d] on the record that having reviewed the testimony of all of the cooperating witnesses who have been called – David Daniyan, Davon Hunter, Sherry Ozmore, Lesley Lucchese, Danielle Cappetti, Victor Barriera, and Jerjuan Joyner as well as [co-conspirator 15] and Crystal Kurschner – the Court finds that the statements made in court, as well as the text messages and communication that was admitted into evidence were statements in furtherance of conspiracy and are therefore not hearsay." Dkt. No. 684 at 5-6.

Defendant does not presently challenge any of the Court's rulings made during trial on this issue. *See* Dkt. No. 532. The Court finds no error regarding its trial rulings related to out-of-court statements by co-conspirators. Defendant's motion on this issue is denied.

### 7. *Prosecutorial Misconduct*

Defendant argues that the Government committed prosecutorial misconduct during its closing statement to the jury because it misled the jury in stating that Defendant was guilty and personally committed fraudulent acts. *See* Dkt. No. 532 at 26-27.

A defendant who alleges "prosecutorial misconduct in summation bears a heavy burden." *United States v. Williams*, 690 F.3d 70, 74-75 (2d Cir. 2012) (internal quotation marks and citation omitted). "The defendant must show not simply that a particular summation comment was improper," but that "the comment, viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced [them], such that the resulting conviction was a denial of due process." *Id.* at 75.

The Court has reviewed the transcript of the Government's closing argument and rebuttal and has found two statements regarding Defendant's guilt are as follows:

> Apply your common sense and that law to the facts of this case and give the defendant the only label that fits the law and the facts of this case. That label isn't Ace G, that label isn't Samuel Bancko, that isn't Legendary. That label, ladies and gentlemen, is one that only you can give him, and it's guilty on all counts. Thank you. . . .
>
> For those reasons, we submit to you beyond -- that the evidence shows beyond a reasonable doubt that the defendant is guilty as charged and that venue has been established by a preponderance of the evidence as to all the counts. Thank you.

Dkt. No. 563 at 87, 143-44.

"So long as a prosecutor does not 'misstate the evidence,' he or she is entitled to 'wide latitude during closing arguments.'" *United States v. Rainford*, 110 F.4th 455, 473 (2d Cir. 2024) (quoting *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998)). "Even if a prosecutor's remarks were improper, a defendant will succeed on a misconduct claim only when 'the remarks, taken in the context of the entire trial, resulted in substantial prejudice.'" *Id.* (quoting *United States v. Thomas*, 377 F.3d 232, 244 (2d Cir. 2004)).

First, Defendant did not object to the Government's statements asserting that the proper verdict would be one of guilt. Second, Defendant has not presented any meritorious argument that the Government's statements resulted in substantial prejudice. The Second Circuit has declined to reverse a conviction where Government counsel made arguably much more severe statements—where "during summation, the prosecutor improperly showed the jury an image of the Defendant framed as their target, as well as an image of the Defendant with the caption 'Guilty[.]'" *United States v. Oreckinto*, 774 Fed. Appx. 698, 702 (2d Cir. 2019) (summary order). The Second Circuit concluded that "[t]he slides at issue were not unduly provocative, nor did they suggest that the jury should find Defendant guilty simply because the prosecutor said so." *Id.* "[T]he district court specifically and correctly instructed the jury that it was 'appropriate for any party . . . to use this kind of demonstrative exhibit in connection with their closing arguments,' and that the slideshow was 'not evidence itself.'" *Id.* (citations omitted). Thus, the Second Circuit held that "even if the prosecutor's use of the slides was improper, any error did not substantially prejudice Defendant." *Id.* at 703.

Here, before the Government presented its summation, the Court told the jury that "[s]ummations are not evidence. The only evidence in this trial comes from the witness stand and

the exhibits that have been received in evidence.  However, to the extent that you find summations helpful, you may certainly consider them."  Dkt. No. 685 at 7.  The Court finds no error in the Government's statements and, even if, the Government did err, the Court finds no prejudice, let alone substantial prejudice in the comments to the jury.  Defendant's motion is denied on this ground.

### 8.  *New Evidence and Request for Evidentiary Hearing*

Rule 33 of the Federal Rules of Criminal Procedure provides that "[o]n the defendant's motion, the court may vacate any judgment and grant a new trial to that defendant if the interest of justice so requires."  FED. R. CRIM. P. 33.  On such a motion, "[t]he defendant bears the burden of proving that he is entitled to a new trial," and in order to grant a new trial, "a district court must find that there is a real concern that an innocent person may have been convicted."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (citation and internal quotation marks omitted).

It is well-established by *Brady* and related authorities that in a criminal prosecution, "the government has an affirmative duty" under the Due Process Clause "to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense."  *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995); *see generally Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972).  If this obligation is violated, the district court may grant a new trial.  That said, not all instances of governmental nondisclosure violate *Brady*, or warrant such relief.  *See United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993).  "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  In other words, true *Brady* material must be (1) favorable, (2) suppressed, and (3) prejudicial.

Additionally, "[a] new trial pursuant to Rule 33 based on newly discovered evidence may be granted 'only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal.'"  *United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007) (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980)).  "[T]he essential elements to be considered in evaluating a defendant's motion for a new trial pursuant to Rule 33" are: "(1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *Id.* (collecting cases); *see also United States v. Forbes*, 790 F.3d 403, 407 (2d Cir. 2015).

Defendant argues that he learned "after trial" that CapCom utilized Genesys Cloud Services.  *See* Dkt. No. 650 at 3.  Defendant states that he learned this through "diligent research," including the fact that Genesys Cloud servers are located in Minnesota, Indiana, and California. *Id.*  Therefore, Defendant argues that the May 5, 2022, call to CapCom in Albany was not actually made to Albany because it was routed through the servers.  *See id.* at 5.  Defendant contends "the [G]overnment possessed or could have obtained from Cap[C]om the technical records showing that the CapCom calls were handled through Genesys Cloud infrastructure, a VoIP system outside the district." Dkt. No. 650 at 6.  He states, "Defendant was unable to view the relevant government exhibits (GX106-106h) during trial.  Upon recently obtaining access to these videos, defendant discovered that none of the recordings show any deposit made by defendant on

November 9, 2023." *Id.* at 9.  Defendant requests permission to issue subpoenas on Genesys and

Broadview Federal Credit Union and for an evidentiary hearing on the matter.  *See* Dkt. No. 658.

The Government argues that the evidence concerning Genesys is not newly discovered or

material.  *See* Dkt. No. 654 at 2.  The Government notes that Defendant admits Mr. Shoemaker

testified about Genesys.  *See id.*  Additionally, the Government argues that it does not matter

where the calls to CapCom were routed because the call was made to an employee who was in

Albany County.  *See id.*  As to Defendant's purported inability to access a certain video, the

Government notes that Defendant fails to explain why he could not access the material, and he

failed to exercise due diligence in seeking access to it.  *See id.*  The Government explains that is

initially provided the discovery to Defendant on January 29, 2024, and again on May 30, 2025.

*See id.* at 3.  Regardless, the Government avers the video Defendant seeks shows Defendant

making deposits into the bank account which is not evidence that would lead to an acquittal*.  See

id.*

First, Defendant's statement that he "determined through diligent research that CapCom

utilized Genesys" "after trial" is false and contradicted in Defendant's own motion.  Dkt. No. 650

at 3.  Defendant acknowledges that Mr. Shoemaker testified CapCom used the Genesys system.

*See id.*  Specifically, during Defendant's cross examination of Mr. Shoemarker, Defendant asked

"So, what is a chain? How does CAP COM keep records of phone calls in the system?"  Dkt. No.

676 at 73.  Mr. Shoemaker responded that "[t]he records are maintained in our phone -- in our

phone system.  The phone system at the time was called Genesys -- . . . and that maintained logs

of any phone calls that came into the credit union." *Id.*  Defendant asked Mr. Shoemaker if he

"produce[d] those documents to the Government, that Genesys phone call records?  Did you

produce anything of that nature to the Government when they asked you to search for call

records?"  *Id.*  Mr. Shoemaker stated that he "produced the recording of the phone call.  I don't

recall if there were additional records that were provided."  *Id.*

    With that testimony, alone, Defendant's motion fails because the evidence was not newly

discovered after trial.  His motion also fails because Defendant does not explain any efforts he

made to obtain the evidence.  *See* Dkt. No. 650.  "The failure to exercise due diligence does not

provide a legal basis for the unavailability of evidence."  *Forbes*, 790 F.3d at 409.  Additionally,

as the Government contends, the evidence is immaterial.  Even if records from Genesys showed

that the calls Defendant made to CapCom were routed through servers located in other states, Mr.

Shoemaker testified that all of the calls "were [] routed through our headquarters in Albany."  Dkt.

No. 676 at 57.  The Government asked, "So anybody who called CAP COM, the phone call was

received right here in Albany?"  *Id.*  Mr. Shoemaker responded, "Yes."  *Id.*

    Likewise, as already explained, it does not matter how many different states the calls were

routed through because they landed in this district.  *See* United States v. Griffith, No. 20-CR-15,

2020 WL 4369650, *2 (S.D.N.Y. July 29, 2020) ("The Second Circuit has held that venue is

proper 'in the district of [a phone call's] initiation as well as the district of its receipt'") (citation

omitted).  Therefore, the evidence would not change the Court's conclusion regarding Defendant's

venue challenge.  A new trial is not warranted on this ground.

    As to the video evidence, Defendant asserts that "[d]uring trial, the [G]overnment

introduced several surveillance videos purported to show [D]efendant [] depositing funds into a

TD Bank account belonging to the Defendant's spouse."  Dkt. No. 650 at 9.  Defendant states

"[t]he prosecution argued that a $9,000 cash deposit made on November 9, 2023[,] allegedly

following fraudulent transactions by co-defendant[]s Bassie and Kurschner at First Heritage

Credit Union (Western District of New York) was made by the [D]efendant."  *Id.*

The Government agrees that it argued Defendant deposited cash proceeds from Bassie and Kurschner's activity on November 9, 2023, but notes that it "did *not* argue that it had a video of the [D]efendant making that deposit." Dkt. No. 654 at 3.[9]

The Court has reviewed Kurschner's testimony and agrees that the Government did not purport to present a video of Defendant making any such deposit. *See* Dkt. No. 677 at 210-23. In the Government's closing, counsel stated that after Bassie and Kurschner went to the Elmira, New York, and conducts fraudulent transactions on November 9, 2023, "[t]he [D]efendant deposits $9,000 in cash into the TD Bank account in his spouse's name." Dkt. No. 563 at 75. After the jury had been released to begin its deliberations, Defendant raised an issue with the Government's closing. Defendant stated "yesterday Government introduced in the closing arguments, I would just -- you know, the Government introduced a transaction [o]n November 9th with Kanie Bassie. Government did not disclose anything about a deposit [that] had been made and the jury did not hear anything about that deposit." Dkt. No. 686 at 14. The Court noted that Defendant needed to object to the Government's statements before the jury began its deliberations. *See id.* The Court informed Defendant that it was the inappropriate time to make his objection. *See id.* at 14-15.

Based on the Court's review of the transcripts, it appears that the Government did not introduce testimony or explicitly discuss the documentary evidence related to a cash deposit made by Defendant on November 9, 2023, after Kurschner's testimony and before the Government's closing. However, in its response, the Government highlights a number of its exhibits that were admitted and presented to the jury which demonstrate its contention regarding the November 9, 2023, transaction and deposit. *See* Dkt. No. 654 at 3. One of those exhibits is number 281,

---

[9] In its response, the Government discusses a transaction on November 9, 2022; however, upon a review of the transcripts and the indictment, the Court believes the appropriate date is 2023.

"records showing large cash deposits into [D]efendant's wife's bank account on the night of November 9, 202[3]." *Id.*; *see also* Dkt. No. 676 at 226.  The Court has reviewed Government Exhibit 281 and agrees that there is a deposit into Defendant's wife's TD Bank account from ATMs in New Jersey on November 9, 2023, at 8:26 p.m. for $8,700.  Gov't. Ex. 281 at 292.

Defendant's argument that there is no video of him depositing the money is immaterial and does not warrant a new trial.  That is because Defendant does not dispute the evidence that the fraudulent transaction occurred.  Nor does he dispute that he deposited the cash into his wife's TD bank account, only that "no ATM video existed." Dkt. No. 650 at 10.  Defendant contends the Government misled the jury by showing other videos of his depositing large cash sums into his wife's bank account.  *See id.* at 13-14.  Defendant argues that "[t]he evidence [is] material because the [G]overnment's case on Count[] Two depended on linking [D]efendant to that deposit." *Id.* at 13.

Defendant is incorrect that this evidence is material to his conviction on count two.  Count two of the indictment charged Defendant with using bank fraud proceeds to purchase other things in furtherance of the conspiracy (fake identifications and rental cars), concealing bank fraud proceeds (using his wife's bank accounts and phone payment applications), and engaging in a transaction over $10,000 with bank fraud proceeds (cashier's checks).  *See* Dkt. No. 299 at ¶11.  Nothing in Defendant's motion negates all of the proof at trial that Defendant engaged in those forms of money laundering.  *See* Dkt. No. 650.  A new trial is not warranted on this ground.

### III. CONCLUSION

Upon careful consideration of the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth herein it is hereby

**ORDERED** that Defendant's motion for release from custody pending his appeal (Dkt. No. 718) is **DENIED**; and the Court further

**ORDERS** that Defendant's motions for a new trial and acquittal (Dkt. Nos. 496, 532, 650, 659) are **DENIED**; and the Court further

**ORDERS** that Defendant's motion requesting the issuance of subpoenas and an evidentiary hearing (Dkt. No. 658) is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to stay restitution pending appeal (Dkt. No. 714) is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated:  March 2, 2026
          Albany, New York

Mae A. D'Agostino
U.S. District Judge